HISTORIC BOARDWALK HALL, LLC, NEW JERSEY SPORTS AND EXPOSITION AUTHORITY, TAX MATTERS PARTNER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11273–07.         Filed January 3, 2011.

New Jersey Sports and Exposition Authority (NJSEA) and Pitney Bowes (PB) formed Historic Boardwalk Hall, LLC, to allow PB to invest in the historic rehabilitation of the East Hall, a popular convention center in Atlantic City, New Jersey. The East Hall underwent a significant rehabilitation during the years at issue. On Forms 1065, U.S. Return of Partnership Income, for 2000, 2001, and 2002, Historic Boardwalk Hall claimed qualified rehabilitation expenditures and allocated those expenditures to PB, allowing PB to claim historic rehabilitation tax credits pursuant to sec. 47, I.R.C. R issued an FPAA asserting alternative grounds for denying PB the claimed rehabilitation tax credits. R's overarching argument is that NJSEA sold the rehabilitation tax credits to PB for a fee. R also argues that the accuracy-related penalty pursuant to sec. 6662, I.R.C., applies. *Held*: Historic Boardwalk Hall was not a sham and did not lack economic substance. *Held*, *further*, PB did become a partner in Historic Boardwalk Hall. *Held*, *further*, NJSEA did transfer the benefits and burdens of ownership of the East Hall to Historic Boardwalk Hall. *Held*, *further*, the sec. 6662, I.R.C., penalty is not applicable.

*Kevin M. Flynn* and *Michael Sardar*, for petitioner.
*Daniel A. Rosen*, *Curt M. Rubin*, *Molly H. Donohue*, and *Sashka T. Koleva*, for respondent.

1

GOEKE, *Judge*: Respondent issued a notice of final partnership administrative adjustment (FPAA) to Historic Boardwalk Hall, LLC (Historic Boardwalk Hall). The issues for decision are:

(1) Whether Historic Boardwalk Hall is a sham;

(2) whether Pitney Bowes was a partner in Historic Boardwalk Hall;

(3) whether New Jersey Sports and Exposition Authority (NJSEA or petitioner) transferred the benefits and burdens of ownership of the East Hall to Historic Boardwalk Hall; and

(4) whether Historic Boardwalk Hall is liable for section 6662[1] accuracy-related penalties for years 2000, 2001, and 2002.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulations of fact and the attached exhibits are incorporated herein by this reference. NJSEA was created by the New Jersey State Legislature in 1971 and is a State instrumentality. NJSEA was initially formed to build, own, and operate the Meadowlands Sports Complex in East Rutherford, New Jersey.

NJSEA's jurisdiction was expanded by the New Jersey State Legislature in January 1992 to include the Atlantic City Convention Center Project. That project authorized NJSEA to build, own, and operate a new convention center and to own and operate the East Hall (the East Hall is also known as Historic Boardwalk Hall).

To carry out the new Convention Center Project, the Atlantic County Improvement Authority (ACIA) and NJSEA entered into a lease for the East Hall whereby NJSEA leased the East Hall for a term of 35 years at a rent of $1 per year. Shortly thereafter, NJSEA entered into an operating agreement with the Atlantic City Convention Center Authority (ACCCA). ACCCA was initially formed to promote tourism in the Atlantic City region, and it would serve as day-to-day manager of the East Hall.

Later, NJSEA and ACCCA entered into a management agreement with Spectator Management Group (SMG). SMG was

---

[1] All section references are to the Internal Revenue Code (Code), and all Rule references are to the Tax Court Rules of Practice and Procedure.

well known for managing, marketing, and developing public assembly facilities, including convention and special event centers. NJSEA contracted to have SMG manage the East Hall because NJSEA felt that a private company would be able to promote, oversee, and manage the East Hall, the West Hall (a facility adjacent to the East Hall), and the soon-to-be constructed convention center. The management agreement stated that SMG would provide operations, marketing, finance, employee supervision, administrative, and other general management services.

SMG managed the East Hall day to day. SMG maintained a system of accounts for Historic Boardwalk Hall, and Historic Boardwalk Hall's annual audited financial statements were based on this system of accounts. Although SMG's initial agreement was for a 3-year term, it has been extended.

1. *Overview of the Transaction at Issue*

Historic Boardwalk Hall was organized under the laws of the State of New Jersey as a limited liability company on June 26, 2000. NJSEA was the sole member of Historic Boardwalk Hall at formation. On September 14, 2000, PB Historic Renovations, LLC (Pitney Bowes),[2] was admitted as a member of Historic Boardwalk Hall.

Historic Boardwalk Hall's purpose was to allow Pitney Bowes to invest in the rehabilitation of the East Hall. Because the East Hall was a historic structure, this rehabilitation project had the potential to earn section 47 historic rehabilitation credits.[3] Historic Boardwalk Hall's formation would allow Pitney Bowes, a private party, to earn these historic rehabilitation credits from the rehabilitation of a public, governmentally owned, building. Respondent argues that in substance the transaction was akin to NJSEA's selling rehabilitation credits to Pitney Bowes. To that end, respondent determined alternatively in the FPAA that Historic Boardwalk Hall is a sham, that Pitney Bowes was never a partner in Historic Boardwalk Hall, and that NJSEA never

---

[2] PB Historic Renovations, LLC, was a limited liability company whose sole member during all relevant periods was Pitney Bowes Credit Corp. During all relevant times, Pitney Bowes Credit Corp. was a wholly owned subsidiary of Pitney Bowes Corp. For simplicity, we refer to PB Historic Renovations, LLC, Pitney Bowes Credit Corp., and Pitney Bowes Corp. as Pitney Bowes.

[3] Sec. 47 allows for a Federal tax credit of 20 percent of the qualified rehabilitation expenditures with respect to any certified historic structure.

transferred ownership of the East Hall to Historic Boardwalk Hall. A finding for respondent on any of these theories would prevent the section 47 rehabilitation credits from flowing to Pitney Bowes; instead they would flow to NJSEA. Petitioner contends instead that transactions like the one at issue were promoted and supported by Congress and are not shams.

2. *East Hall History*

Construction of the East Hall began in 1926 and was completed in 1929. It is located prominently at the center of the Atlantic City, New Jersey, Boardwalk and faces the Atlantic Ocean. The East Hall was a popular event space of exceptionally large dimensions, featuring an auditorium with a 130-foot ceiling and over 250,000 square feet of floor space.

After it was completed, the East Hall hosted a number of public events, including hockey matches, professional football games, and equestrian shows. The East Hall also hosted trade shows, conferences, meetings, and musical performances, including those of the Beatles and the Rolling Stones. Beginning in 1933, the East Hall hosted the Miss America pageant.

The East Hall was listed as a National Historic Landmark by the U.S. Department of the Interior on February 27, 1987. In January 1992 the New Jersey State Legislature authorized NJSEA to undertake construction of the new convention center and renovation of the East Hall. Once the new convention center was completed, it was expected to become the primary location for flat-floor conventions like the ones that had until that time been held in the East Hall. As a result, the East Hall would no longer draw those types of events and would have no use unless renovated.

Once construction began on the new convention center, representatives of NJSEA and other New Jersey State officials began to study and make plans for the future of the East Hall. Because it had become run down, the only way to make the East Hall usable again was to convert it to a special events facility that could host concerts, sporting events, family shows, and other civic events. This conversion would require that the East Hall be substantially rehabilitated. State officials in New Jersey decided to rehabilitate the East Hall and convert it into a mixed-use space.

Rehabilitation of the East Hall began in December 1998. It was to be completed in four phases: (1) Construction of scaffolding suspended from the auditorium's ceiling to facilitate rehabilitation of the ceiling; (2) removal of auditorium ceiling tiles and abatement of asbestos; (3) reconstruction of the ceiling using glass-fiber reinforced tiles and high-performance acoustical perforated aluminum tiles; and (4) construction of a new permanent arena seating bowl, construction of support services and patron amenities beneath the seating bowl, and restoration and historically accurate painting of the Hall's interior.

To pay for a portion of the renovation costs, on June 15, 1999, NJSEA issued about $49.5 million of State bonds. In addition, NJSEA received approximately $22 million from the New Jersey Casino Reinvestment Development Authority.[4] In the absence of an equity investor, the rehabilitation would have been funded entirely by the State of New Jersey.

### 3. *Sovereign Capital Resources, LLC*

In late 1998, Paul Hoffman (Mr. Hoffman) of Sovereign Capital Resources, LLC (Sovereign), contacted representatives of NJSEA. Sovereign was founded by Mr. Hoffman and a partner in 1995. Mr. Hoffman contacted NJSEA because he had learned of the East Hall renovation; one of Sovereign's business lines was raising equity for historic rehabilitations. NJSEA engaged the services of Sovereign to act as its financial adviser in finding an equity investor for the East Hall's rehabilitation. Respondent argues that this was not an investment, but rather Sovereign was facilitating a sale of the historic tax credits generated by the East Hall rehabilitation.

NJSEA engaged several law firms to review and opine on certain aspects of the transaction: (1) Wolf, Block, Schorr, Solis-Cohen, LLP; (2) Gibbons, Del Deo, Dolan, Griffinger & Vecchione (Gibbons, Del Deo); and (3) Wolf & Sampson, P.C. NJSEA also engaged the accounting firm of Reznick Fedder & Silverman, P.C. (Reznick), to provide counsel on the rehabilitation credit transaction.

---

[4] The New Jersey Casino Reinvestment Development Authority is a State agency created by the New Jersey State Legislature that uses funds generated from governmental charges imposed on the casino industry for economic development and community projects throughout the State. The funds given to NJSEA were in the form of a grant.

4. *Confidential Offering Memorandum*

Sovereign prepared a confidential offering memorandum as part of its services to NJSEA. The memorandum was prepared using information provided to Soverign by NJSEA, Reznick, and others and included financial information for the rehabilitation of the East Hall and for its operation after the rehabilitation was completed.

The financial projections in the confidential offering memorandum were based on certain assumptions, most importantly that revenue from the East Hall would increase 3 percent per year. The financials projected that the eventual partnership would have positive net operating income from 2002 through 2009. That net operating income would be zeroed out through lease payments, an increase in a "replacement reserve", the investor member's 3-percent priority distribution, and an incentive management fee, to the extent there was cash to make those payments.

The confidential offering memorandum also informed prospective investors that Historic Boardwalk Hall would have taxable losses for at least the years 2002 through 2009.

The financial projections attached to the amended and restated operating agreement, discussed more fully below, are different from those attached to the confidential offering memorandum.

The memorandum was sent to 19 corporations and described the transaction as a "sale" of tax credits. The memorandum indicated that the private investor's equity investment would be used to pay a development fee to NJSEA, with any surplus remaining with Historic Boardwalk Hall. Four corporations showed interest in joining the transaction, and each submitted a bid detailing how much it would be willing to invest depending on the rehabilitation credits it would earn. Eventually Pitney Bowes' offer was accepted and it was selected to invest in Historic Boardwalk Hall.

5. *Formation of Historic Boardwalk Hall*

Historic Boardwalk Hall, organized on June 26, 2000, elected to be treated as a partnership for Federal income tax purposes. NJSEA was the sole member at formation and executed an operating agreement for the East Hall, as explained above. When Pitney Bowes joined Historic Board-

walk Hall on September 14, 2000, NJSEA and Historic Boardwalk Hall signed an amended and restated operating agreement (the AREA). The AREA identified NJSEA as managing member and Pitney Bowes as investor member of Historic Boardwalk Hall. Pursuant to the terms of the AREA, Pitney Bowes has a 99.9-percent ownership interest in Historic Boardwalk Hall. NJSEA owns the remaining 0.1 percent. Profits, losses, tax credits, and net cashflow are allocated to Historic Boardwalk Hall's members according to their ownership interests.

The AREA stated that Historic Boardwalk Hall was formed to acquire, develop, finance, rehabilitate, own, maintain, operate, license, and sell or otherwise dispose of the East Hall for use as a special events facility to hold events including, but not limited to, spectator sporting events. The AREA made clear that the potential rehabilitation tax credits were an integral part of the transaction but did not use the term "sale". It referred to both Pitney Bowes and NJSEA as members of Historic Boardwalk Hall.

Article 3.01 of the AREA reiterated the purpose of Historic Boardwalk Hall and also granted Historic Boardwalk Hall the authority to take actions necessary to carry out its purpose.

The AREA included an additional set of financial information. The most important difference between these financials and those attached to the confidential offering memorandum was the inflation factor applied to the East Hall's revenues. The financial projections attached to the AREA used a 3.5-percent inflator, rather than the 3.0-percent inflator in the confidential offering memorandum. Also, the operating assumptions underlying the updated financials assumed higher service income, parking revenue, and novelty revenue in the first year of operations. Operating expenses for the initial years remained the same.

As a result of higher projected revenues, the statement of projected cashflows attached to the AREA showed higher payments to the equity investor and also payments on the acquisition and construction loans discussed below. These financials, however, still resulted in a taxable net loss.

6. *Lease and Sublease of the East Hall*

As discussed above, NJSEA leased the East Hall from ACIA for a 35-year term. On September 14, 2000, NJSEA amended its lease agreement to extend the lease term until November 11, 2087. On that date, NJSEA and Historic Boardwalk Hall entered into two agreements. First, NJSEA as sublessor and Historic Boardwalk Hall as sublessee entered into a sublease of the East Hall whereby NJSEA subleased the property to Historic Boardwalk Hall. Second, NJSEA and Historic Boardwalk Hall entered into a lease agreement which the parties treated as a sale and purchase for Federal, State, and local income tax purposes. Pursuant to the lease agreement, Historic Boardwalk Hall purportedly acquired ownership of the East Hall.

Historic Boardwalk Hall paid for the East Hall by an acquisition note in the amount of $53,621,405. The acquisition note was secured by a mortgage on the property. The amount of the acquisition note represented the total expenditures that NJSEA had made through that date in renovating the East Hall. The acquisition note bears interest at 6.09 percent per year and provides for level annual payments of $3,580,840 through the year 2040, to the extent Historic Boardwalk Hall has sufficient cash to make the annual payments.

Also on September 14, 2000, NJSEA entered into a construction loan agreement with Historic Boardwalk Hall to lend amounts to the partnership from time to time to pay for the remainder of renovations to the East Hall. At that time, NJSEA agreed to lend $57,215,733 to Historic Boardwalk Hall. NJSEA's obligation to lend to Historic Boardwalk Hall was evidenced by a mortgage note and a second mortgage on the property.

7. *Contributions to Historic Boardwalk Hall*

Pitney Bowes made capital contributions to Historic Boardwalk Hall and also lent funds to the partnership. Pursuant to the AREA, Pitney Bowes was to make four capital contributions totaling $18,195,757.

Pitney Bowes made the following contributions to Historic Boardwalk Hall:

| *Date* | *Amount* |
|--------|---------:|
| 9/14/00 .................................................................. | $650,000 |
| 12/19/00 ................................................................ | 3,660,765 |
| 1/17/01 [1] ............................................................ | 3,400,000 |
| 10/30/02 ................................................................ | 10,467,849 |
| 2/12/04 .................................................................. | [2] 1,173,182 |

[1] The Dec. 19, 2000, and Jan. 17, 2001, capital contributions were together considered Pitney Bowes' second capital contribution, even though the contribution was made on two separate dates.

[2] A portion of Pitney Bowes' fourth capital contribution was paid and is currently being held in escrow.

Pitney Bowes also made an investor loan of $1.1 million to Historic Boardwalk Hall on September 14, 2000. The principal amount of the investor loan was increased to $1,218,000 on or around October 30, 2002.

Pitney Bowes was not required to make the second, third, or fourth capital contribution if certain requirements in the AREA were not satisfied.

The AREA provided that Pitney Bowes' capital contributions were to be used to pay down the principal on the acquisition note. Pitney Bowes' capital contributions were in fact used to pay down the principal on the acquisition note. Shortly thereafter, a corresponding draw would be made on the construction note, and NJSEA would advance those funds to Historic Boardwalk Hall. Ultimately, these offsetting draws left Historic Boardwalk Hall with cash in the amount of Pitney Bowes' capital contributions, a decreased balance on the acquisition loan, and an increased balance on the construction loan. These funds were then used by Historic Boardwalk Hall to pay assorted fees related to the transaction and to pay NJSEA a developer's fee for its work managing and overseeing the East Hall's rehabilitation.

A portion of Pitney Bowes' second capital contribution was not returned to Historic Boardwalk Hall but rather was used by NJSEA to purchase the guaranteed investment contract (GIC). The GIC is discussed further below.

Historic Boardwalk Hall paid NJSEA $14 million as a development fee for its role overseeing the East Hall's rehabilitation. This came mainly from Pitney Bowes' third and fourth capital contributions and was paid pursuant to a development agreement between Historic Boardwalk Hall

and NJSEA. The development agreement reiterated Historic Boardwalk Hall's purpose and imposed certain obligations on NJSEA as the developer, in exchange for a $14 million development fee. The development agreement obligated NJSEA to obtain all required Government approvals for the rehabilitation and to oversee the completion of the rehabilitation. This included: (1) Overseeing the contractors who were rehabilitating the East Hall; (2) ensuring that all amenities consistent with the overall rehabilitation were put in place; (3) causing the completion of phase 3 of the rehabilitation; and (4) causing the rehabilitation such that it would earn rehabilitation tax credits. The development agreement further required NJSEA to obtain certification of the rehabilitation from the U.S. Department of the Interior and to maintain insurance over the rehabilitation as set forth in the AREA. NJSEA's development fee would not be earned until the rehabilitation was completed, and it was payable immediately upon completion.

8. *Distributions From Historic Boardwalk Hall*

The AREA provided for the distribution of Historic Boardwalk Hall's net cashflow. First, if certain title insurance or environmental insurance proceeds were paid, 100 percent went to Pitney Bowes. Second, any remaining net cashflow was used to make interest payments on Pitney Bowes' investor loan to Historic Boardwalk Hall.

Should there be any remaining net cashflow, 99.9 percent was to be distributed to Pitney Bowes until Pitney Bowes had received its 3-percent preferred return. The preferred return was equal to 3 percent of its adjusted capital contribution, which was determined at the end of Historic Boardwalk Hall's fiscal year.

Next, funds were distributed to Pitney Bowes to cover any Federal, State, and local income taxes paid on taxable income allocated to Pitney Bowes. Any remaining net cashflow was then distributed to NJSEA for current and accrued but unpaid debt service on the acquisition and construction notes, and then to NJSEA to repay any operating deficit loans. Lastly, any remaining net cashflow was paid to Pitney Bowes and NJSEA in accordance with their membership interests.

9. *Environmental Concerns and Analysis*

The parties were concerned that the East Hall's rehabilitation would lead to certain environmental hazards. To that end, Pitney Bowes retained the law firm of Kelley Drye & Warran, LLP, to assess Historic Boardwalk Hall and Pitney Bowes' potential liability for environmental claims.

In order to determine any potential environmental issues, Historic Boardwalk Hall obtained reports that evaluated the East Hall for potential hazards and also provided remediation plans.

Environmental Partners, Inc., prepared a Phase I Environmental Site Assessment for Pitney Bowes. The report identified certain environmental hazards, including asbestos, possibly lead-based paint, underground storage tanks, and other chemical hazards. The report characterized the East Hall as an "unknown risk" and concluded that environmental liabilities could not be estimated at that time without more analysis of the East Hall.

L. Robert Kimball & Associates, Inc., also prepared a hazardous materials assessment (the Kimball report) of the East Hall, focusing on asbestos, lead-based paint, hazardous materials storage, drainage, roof deterioration, and certain hazardous chemicals that might be present or become exposed by the East Hall's rehabilitation. The Kimball report then went on to evaluate how potential hazards should be dealt with and estimated what remediation would cost. The Kimball report estimated that remediation would cost more than $3 million.

The AREA contained certain representations by NJSEA to Pitney Bowes concerning the East Hall and its rehabilitation with regard to environmental hazards. First, NJSEA warranted to Pitney Bowes that there were no known environmental hazards other than those identified in the environmental assessments. NJSEA also warranted that if any new environmental hazards were uncovered, NJSEA would remediate them in its role as managing member. Second, NJSEA warranted that should it default in its role to remediate any environmental hazards, it would hold Pitney Bowes harmless and indemnify it for any costs incurred as a result of NJSEA's default. NJSEA also held environmental liability insurance. Historic Boardwalk Hall was a named insured on

the insurance policy, and Pitney Bowes was later added as an additional insured.

10. *Future Transfers of Pitney Bowes' Interest*

NJSEA and Pitney Bowes contemplated Pitney Bowes' disposing of its membership interest and leaving Historic Boardwalk Hall. To that end, they negotiated a number of possible ways to transfer Pitney Bowes' interest to NJSEA.

A. *Pitney Bowes Repurchase Option*

The AREA provided two options. First, article 5.03 gave Pitney Bowes the authority to require NJSEA to purchase Pitney Bowes' interest in Historic Boardwalk Hall. If Pitney Bowes exercised its option under this article, NJSEA would have to purchase its membership interest for a price equal to: (1) Pitney Bowes' capital contributions up to that point plus 15 percent interest; (2) Pitney Bowes' reasonable third-party fees and expenses with regard to the transaction; and (3) $100,000 as a reimbursement for Pitney Bowes' internal expenses with regard to the transaction. NJSEA had to make the $100,000 reimbursement payment only if phase 3 of the rehabilitation [5] was not placed in service for purposes of the rehabilitation tax credit by December 31, 2000, or if the rehabilitation tax credits were less than $650,000 for tax year 2000 for any reason. Pitney Bowes could exercise its repurchase option contained in article 5.03 only until January 15, 2001.

B. *NJSEA Management Purchase Option*

Article 8.02(a) and (b) of the AREA imposed certain restrictions on NJSEA's authority as managing member. Article 8.02(a) prevented NJSEA from performing any act in violation of the law, performing any act in violation of any project documents, doing any act that required Pitney Bowes' consent, or borrowing or commingling any of Historic Boardwalk Hall's funds.

Article 8.02(b) prevented NJSEA from selling, refinancing, or disposing of Historic Boardwalk Hall's assets, materially

---

[5] Phase 3 involved the rehabilitation of the East Hall's ceiling. This included replacing the ceiling tiles and the lighting system and installing a computer-controlled light system at the base of each ceiling bay that would allow for the projection of sunsets and other theatrical effects onto the new ceiling tiles.

modifying Historic Boardwalk Hall's insurance plan, amending any of the main transaction documents, borrowing any money other than the acquisition or construction loans, or taking any action that would adversely affect Pitney Bowes, either as a member or financially.

These prohibitions were not absolute. Both article 8.02(a) and (b) gave NJSEA the option to purchase Pitney Bowes' membership interest before taking any of the prohibited actions. To exercise its options, NJSEA would have to give written notice of its intent to purchase Pitney Bowes' interest and would have to actually purchase the interest within 90 days of providing such notice.

If it exercised its options, NJSEA would have to pay Pitney Bowes the present value of the projected tax benefits and the projected cashflow to be distributed to Pitney Bowes. The projected cashflows were limited to the projected tax benefits up until the first date that NJSEA could exercise its purchase option (discussed below), and to the extent that Pitney Bowes had received any tax benefits or cashflows at the time NJSEA decided to purchase Pitney Bowes' interest. Thus, if NJSEA exercised its option under article 8.02(a) or (b), its payment obligation would be based on its projected obligations from that date until the earliest date it could have otherwise opted to purchase Pitney Bowes' membership interest.

C. *Future Purchase Options*

Lastly, the parties negotiated two additional agreements that would allow NJSEA to reacquire Pitney Bowes' membership interest in Historic Boardwalk Hall. On September 14, 2000, Pitney Bowes and NJSEA entered into two option contracts. These were the "purchase option agreement" and the "agreement to compel purchase".

The purchase option agreement gave NJSEA the right to purchase Pitney Bowes' membership interest in Historic Boardwalk Hall. NJSEA could execute the purchase option agreement at any time during a 12-month period beginning 60 months after the entire East Hall was placed in service for purposes of determining the historic rehabilitation credits. Thus, from 60 months to 72 months after the East Hall was placed in service, NJSEA had the option to purchase

Pitney Bowes' interest. The option would expire at the end of the 12-month period.

If the purchase option agreement was not executed, the agreement to compel purchase gave Pitney Bowes the right to require NJSEA to purchase Pitney Bowes' membership interest in Historic Boardwalk Hall. Pitney Bowes may exercise this option during a 12-month period beginning 84 months after the East Hall is placed in service for purposes of determining the historic rehabilitation credits. Like the purchase option agreement, the agreement to compel purchase was available only for 12 months.

Both options require NJSEA to pay Pitney Bowes the greater of: (1) 99.9 percent of the fair market value of 100 percent of the membership interests in Historic Boardwalk Hall; or (2) any accrued and unpaid preferred return.

At the time of trial, none of the options had been exercised, and Historic Boardwalk Hall continued to operate with Pitney Bowes and NJSEA as its only members.

## 11. *Guaranteed Investment Contract*

In order to secure NJSEA's payment if NJSEA reacquired Pitney Bowes' interest in Historic Boardwalk Hall, the AREA required NJSEA to purchase a GIC.

As discussed above, Pitney Bowes' capital contributions were initially used to pay down the principal on the acquisition loan. Shortly thereafter, a corresponding draw would be made on the construction loan, leaving Historic Boardwalk Hall with the capital contribution. This did not occur with respect to Pitney Bowes' entire second capital contribution. Although the second capital contribution was used to pay down the acquisition loan, a corresponding draw was not made on the construction loan. NJSEA, retaining these funds, used a portion of the capital contribution to fund the purchase of the GIC.

First Union National Bank (First Union) was appointed escrow agent for both Pitney Bowes and NJSEA. NJSEA deposited about $3.2 million of Pitney Bowes' second capital contribution with First Union. First Union then entered into a master repurchase agreement with Transamerica Occidental Life Insurance Co. The master repurchase agreement was then pledged as collateral to secure NJSEA's payment obliga-

tion if, under either the purchase option or the agreement to compel purchase, it was required to purchase Pitney Bowes' membership interest in Historic Boardwalk Hall.

### 12. *Tax Benefits Guaranty*

NJSEA, Pitney Bowes, and Historic Boardwalk Hall foresaw the possibility that the Internal Revenue Service (IRS) would challenge the reporting of the East Hall's rehabilitation. Consequently, the AREA appointed NJSEA as Historic Boardwalk Hall's tax matters partner and provided for the appointment of counsel by NJSEA should the transaction be challenged. Pitney Bowes had final approval over the appointment of counsel to represent Historic Boardwalk Hall.

Pitney Bowes and Historic Boardwalk Hall also executed a "Tax Benefits Guaranty Agreement" by which Historic Boardwalk Hall guaranteed the projected tax benefits allocable to Pitney Bowes. NJSEA was required to fund any payments made pursuant to the tax benefits guaranty.

The tax benefits guaranty provides that it was entered into to induce Pitney Bowes, as investor, to acquire an interest in Historic Boardwalk Hall. Its ultimate purpose was to require NJSEA to make Pitney Bowes whole should any part of the tax benefits be successfully challenged by the IRS.

### 13. *Opinion Letters*

NJSEA and Pitney Bowes sought and received opinion letters concerning various aspects of the transaction.

Wolf Block prepared a tax opinion letter (Wolf Block opinion) analyzing the East Hall transaction. The Wolf Block opinion analyzed numerous Federal tax issues and concluded in pertinent part that Historic Boardwalk Hall was properly classified as a partnership, Historic Boardwalk Hall owned the East Hall, and the transaction did not violate the economic substance or sham transaction doctrines.

The Wolf Block opinion relied on a number of other legal opinions in reaching those conclusions. These other opinion letters analyzed various non-tax-related legal questions raised by the East Hall's rehabilitation and Pitney Bowes' investment. Gibbons, Del Deo opined that NJSEA had the authority to act on behalf of the State of New Jersey, that Historic Boardwalk Hall was a valid LLC, and that Pitney

Bowes became a member of Historic Boardwalk Hall under State law. Wolf & Samson, P.C., issued a letter concerning how New Jersey State law and NJSEA's being financed by State bonds would affect NJSEA's obligations under the AREA to fund any deficits and any additional construction costs. Madison & Sutro, LLP, provided an opinion letter evaluating the proper classification of the acquisition note, the construction note, and Pitney Bowes' investor loan as debt rather than equity.

### 14. *Rehabilitation and Operation of the East Hall*

Bank accounts were established by SMG as agent for Historic Boardwalk Hall. After February of 2001, account statements show regular activity, including both deposits to and checks written on the account.

NJSEA had entered into contracts with various third parties regarding certain aspects of the East Hall's rehabilitation. These contracts were all assigned to Historic Boardwalk Hall at or around the time Pitney Bowes became a member in Historic Boardwalk Hall. These contracts dealt mainly with contractors who were engaged to perform various pieces of the rehabilitation of the East Hall.

The renovation of the East Hall and its conversion to a special events arena was a success. Since its rehabilitation, the East Hall has held performances by a number of well-known entertainers, and its revenues in 2000, 2001, and 2002 exceeded those in the Reznick projections. However, the East Hall has operated at a deficit.

### 15. *Procedural Posture*

Historic Boardwalk Hall timely filed Forms 1065, U.S. Return of Partnership Income, for 2000, 2001, and 2002. The Forms 1065 showed income, deductions, and ultimately net losses for all 3 years. The deductions included the costs of wages for employees who were operating the East Hall. Historic Boardwalk Hall claimed the following qualified rehabilitation expenses:

| *Year* | *Expenditures* |
|---|---|
| 2000 | $38,862,877 |
| 2001 | 68,865,639 |
| 2002 | 1,271,482 |

Schedules K–1, Partner's Share of Income, Credits, Deductions, etc., were issued to Pitney Bowes and NJSEA in accordance with their membership interests.

On February 22, 2007, respondent issued the FPAA covering the 2000, 2001, and 2002 tax years to Historic Boardwalk Hall. The FPAA determined that any items of income or loss or separately stated items reported on Historic Boardwalk Hall's Forms 1065 and allocated to Pitney Bowes were reallocated to NJSEA. The FPAA also determined that underpayments of tax attributable to those adjustments would be subject to the section 6662 penalty.

The FPAA contained an "Explanation of Adjustments" which provided alternative arguments in support of the adjustments made in the FPAA, including that:

(1) Historic Boardwalk Hall was created for the express purpose of improperly passing along tax benefits to Pitney Bowes and is a sham;

(2) Pitney Bowes' stated partnership interest in Historic Boardwalk Hall was not bona fide because Pitney Bowes had no meaningful stake in the success or failure of Historic Boardwalk Hall;

(3) the East Hall was not "sold" to Historic Boardwalk Hall because the benefits and burdens of ownership did not pass to Historic Boardwalk Hall. Accordingly, any items of income or loss or separately stated items attributable to ownership of the East Hall were disallowed;

(4) respondent pursuant to his authority in the antiabuse provisions of section 1.701–2(b), Income Tax Regs., had determined that Historic Boardwalk Hall should be disregarded for Federal income tax purposes; and

(5) all or part of the underpayments of tax attributable to the adjustments in the FPAA were attributable to either negligence, a substantial understatement of income tax, or both.

Petitioner filed its petition in response to the FPAA on May 21, 2007. A trial was held from April 13–16, 2009, in New York, New York. Respondent submitted an expert report in support of his position.

OPINION

## I. *TEFRA in General*

Partnerships do not pay Federal income taxes, but they are required to file annual information returns reporting the partners' distributive shares of tax items. Secs. 701, 6031. The individual partners then report their distributive shares of the tax items on their Federal income tax returns. Secs. 701–704. A limited liability company with two or more members is treated as a partnership unless it elects to be treated as a corporation. Sec. 301.7701–3(b)(1)(i), Proced. & Admin. Regs. Historic Boardwalk Hall did not elect to be treated as a corporation and thus is treated as a partnership for Federal income tax purposes.

To remove the substantial administrative burden occasioned by duplicative audits and litigation and to provide consistent treatment of partnership tax items among partners in the same partnership, Congress enacted the unified audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97–248, sec. 402, 96 Stat. 648. See *Randell v. United States*, 64 F.3d 101, 103 (2d Cir. 1995); H. Conf. Rept. 97–760, at 599–600 (1982), 1982–2 C.B. 600, 662–663.

Under TEFRA, all partnership items are determined in a single partnership-level proceeding. Sec. 6226; see also *Randell v. United States*, *supra* at 103. The determination of partnership items in a partnership-level proceeding is binding on the partners and may not be challenged in a subsequent partner-level proceeding. See secs. 6230(c)(4), 7422(h). This precludes the Government from relitigating the same issues with each of the partners.

In partnership-level proceedings such as the case before us, the Court's jurisdiction is limited by section 6226(f) to a redetermination of partnership items and penalties on those partnership items. Section 6231(a)(3) defines the term "partnership item" as any item required to be taken into account for the partnership's taxable year under any provision of subtitle A of the Code to the extent the regulations provide that such item is more appropriately determined at the partnership level than at the partner level.

The question whether a partnership is a sham is a partnership item more appropriately determined at the partnership

level. *Petaluma FX Partners, LLC v. Commissioner*, 131 T.C. 84, 95 (2008), affd. in pertinent part 591 F.3d 649 (D.C. Cir. 2010). Likewise, whether Pitney Bowes was a partner in Historic Boardwalk Hall is also a partnership item more appropriately determined at the partnership level. See *Blonien v. Commissioner*, 118 T.C. 541 (2002). Further, the determination whether NJSEA contributed the East Hall to Historic Boardwalk Hall is also a partnership item. *Nussdorf v. Commissioner*, 129 T.C. 30, 41–42 (2007). Lastly, respondent's determination that the transaction should be recast to carry out the intent of subchapter K is likewise a partnership item. Neither party disputes our jurisdiction over these items.

## II. *Burden of Proof*

The Commissioner's determinations in an FPAA are generally presumed correct, and a party challenging an FPAA has the burden of proving that the Commissioner's determinations are in error. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Republic Plaza Props. Pship. v. Commissioner*, 107 T.C. 94, 104 (1996). The burden of proof on factual issues that affect a taxpayer's liability for tax may be shifted to the Commissioner where the "taxpayer introduces credible evidence with respect to * * * such issue." Sec. 7491(a)(1).

Petitioner argues that the burden shifts to respondent under section 7491(a). Respondent disagrees and argues that petitioner has not satisfied the requirements of section 7491. A shift in the burden of persuasion "has real significance only in the rare event of an evidentiary tie." *Blodgett v. Commissioner*, 394 F.3d 1030, 1039 (8th Cir. 2005), affg. T.C. Memo. 2003–212. We decide this case on the preponderance of the evidence, and the burden of proof is not a factor in our analysis. We will address each of respondent's arguments in turn.

## III. *Economic Substance*

Respondent first argues that Historic Boardwalk Hall lacks economic substance. Both parties agree that an appeal in this case lies in the Court of Appeals for the Third Circuit. See sec. 7482. The Court of Appeals for the Third Circuit has

stated that a court is to "analyze two aspects of a transaction to determine if it has economic substance: its objective economic substance and the subjective business motivation behind it." *IRS v. CM Holdings, Inc.*, 301 F.3d 96, 102 (3d Cir. 2002). However, in *CM Holdings, Inc.* the court went on to state that these aspects do not constitute discrete prongs of a "'rigid two-step analysis'" but "'represent related factors both of which inform the analysis of whether the transaction had sufficient substance, apart from its tax consequences, to be respected for tax purposes.'" *Id.* (quoting *ACM Pship. v. Commissioner*, 157 F.3d 231, 247 (3d Cir. 1998), affg. in part and revg. in part T.C. Memo. 1997–115). If, however, a transaction "'affects the taxpayer's net economic position, legal relations, or non-tax business interests, it will not be disregarded merely because it was motivated by tax considerations.'" *Id.*

Respondent argues that Historic Boardwalk Hall is a sham because it lacked objective economic substance and that its partners lacked any business motivation other than transferring historic tax credits from NJSEA to Pitney Bowes. Respondent asks that we look to the individual partners to determine the economic substance of the transaction.

Respondent contends that Historic Boardwalk Hall lacked objective economic substance because the parties, in respondent's view, negotiated and executed a transaction in anticipation of a limited number of possible outcomes, none of which would appreciably affect Pitney Bowes' economic position other than through a reduction of its tax liabilities.

Respondent argues that the following are the only possible outcomes of Historic Boardwalk Hall's formation, assuming the parties act in an "economically rational manner".

(1) If the East Hall was profitable, NJSEA would be compelled to exercise its repurchase option immediately after the section 47 recapture period ended, terminating Pitney Bowes' interest in Historic Boardwalk Hall. Pitney Bowes would receive its 3-percent annual return until it exited Historic Boardwalk Hall through preferred net cashflow distributions.

(2) If the East Hall was unprofitable, Pitney Bowes would exercise its put option, compelling NJSEA to purchase its interest in Historic Boardwalk Hall for its 3-percent annual return. In this case, because East Hall is unprofitable and

there are no preferred net cashflow distributions, Pitney Bowes receives its payment through the GIC.

Respondent contends that the parties knew that Historic Boardwalk Hall would not earn a profit and that the Reznick projections showing a profit were simply window dressing meant to give the transaction an appearance of legitimacy.

Respondent further argues that Pitney Bowes would never earn a profit on its investment in Historic Boardwalk Hall. In respondent's view, although Pitney Bowes was entitled to its 3-percent return either through preferred distributions or the GIC, Historic Boardwalk Hall still lacked objective business substance because any return would be less than Pitney Bowes could have earned had it invested its capital contributions in other financial instruments. Taking into account the time value of money, respondent argues that Pitney Bowes' investment results in a negative cashflow to Pitney Bowes.

Respondent also argues that other contractual provisions ensure that Historic Boardwalk Hall has no economic effect on its partners, including the tax benefits guaranty agreement, the operating deficit guaranty, the completion guaranty, and the fact that all of Historic Boardwalk Hall's debts are nonrecourse to Pitney Bowes. Respondent concludes that the parties' economic positions were all fixed and unaffected by the return from Historic Boardwalk Hall in any circumstance.

Moving to the subjective test, respondent argues that Historic Boardwalk Hall served no subjective business purpose because it was intended solely to facilitate NJSEA's sale of rehabilitation tax credits and other favorable tax attributes to Pitney Bowes.

All of respondent's arguments concerning the economic substance of Historic Boardwalk Hall are made without taking into account the 3-percent return and the rehabilitation credits. Respondent argues that the rehabilitation credits must be ignored in evaluating the economic substance of Historic Boardwalk Hall. Respondent points to *Friendship Dairies, Inc. v. Commissioner*, 90 T.C. 1054 (1988), and argues that investment tax credits are never to be taken into account in determining the economic substance of a transaction.

Petitioner first argues that the economic substance doctrine is inapplicable to the Historic Boardwalk Hall trans-

action because Congress, in enacting and amending section 47, intended to use section 47 to spur corporations to invest in historic rehabilitation projects that otherwise would not be economically feasible. Petitioner further contends that the point of the credit was to address the reality that most rehabilitation projects had an inherent lack of profitability— thus it would be inappropriate to disregard a transaction for lack of profitability when the purpose of section 47 is to make up for that lack of profitability.

Further, petitioner puts forth alternative arguments in support of its position that the Historic Boardwalk Hall transaction has economic substance. First, petitioner argues that the rehabilitation tax credits at issue can be taken into account in determining whether the transaction has economic substance and provided a net economic benefit to Pitney Bowes. Petitioner points to *Sacks v. Commissioner*, 69 F.3d 982 (9th Cir. 1995), revg. T.C. Memo. 1992–596, and argues that we must take the rehabilitation credits into account in determining the profitability of the transaction.

Second, petitioner argues that even if we do not take the rehabilitation tax credits into account, the Reznick projections show that the Historic Boardwalk Hall has economic substance because Pitney Bowes and the East Hall had a chance of earning a profit.

Petitioner also asserts the 3-percent return gives the transaction economic significance.

In *Sacks v. Commissioner*, *supra*, the Court of Appeals for the Ninth Circuit evaluated the economic substance of a solar energy equipment sale-leaseback transaction. The Court of Appeals found that the transaction had economic substance on the basis of the following factors:

(1) The taxpayer's personal obligation to pay the price was genuine;

(2) the taxpayer paid fair market value for the equipment;

(3) the tax benefits would have existed for someone and were not created out of thin air by the transaction;

(4) the business of selling solar energy was genuine; and

(5) the business consequences of a rise or fall in energy prices were genuinely shifted to the taxpayer.

*Id.* at 988. The Court of Appeals discussed whether the solar energy credits should be taken into account in determining

the profitability of the transaction. The Commissioner had argued successfully in this Court that any financial analysis of the transaction had to be done without regard to the solar energy credits. On the basis of that argument, we found that the taxpayer's transaction lacked economic substance because it was cashflow negative unless the tax credits were taken into account and disallowed the claimed credits.

The Court of Appeals disagreed with that analysis, stating that the taxpayer's investment "did not become a sham just because its profitability was based on after-tax instead of pre-tax projections." *Id.* at 991. The Court of Appeals went on to state that "Where a transaction has economic substance, it does not become a sham merely because it is likely to be unprofitable on a pre-tax basis", *id.*, and that "Absence of pre-tax profitability does not show 'whether the transaction had economic substance beyond the creation of tax benefits,' where Congress has purposely used tax incentives to change investors' conduct", *id.* (citation omitted). The Court of Appeals rejected the Commissioner's argument that the tax benefits should be excluded from the economic analysis because "If the government treats tax-advantaged transactions as shams unless they make economic sense on a pretax basis, then it takes away with the executive hand what it gives with the legislative." *Id.* at 992. Ultimately, the Court of Appeals recognized that if the types of transactions that Congress intended to encourage had to be profitable on a pretax basis, then Congress would not have needed to provide incentives to get taxpayers to invest in them; in effect, the Commissioner was attempting to use the reason Congress created the tax benefits as a ground for denying them. *Id.*

The Court of Appeals for the Third Circuit has not directly addressed whether investment tax credits are to be taken into account in determining the economic substance of a transaction. In *IRS v. CM Holdings, Inc.*, 301 F.3d 96 (3d Cir. 2001), the taxpayer attempted to rely on the opinion of the Court of Appeals for the Ninth Circuit in *Sacks* in arguing that a corporate-owned life insurance plan had economic substance because Congress had explicitly sanctioned those types of tax strategies. However, the Court of Appeals for the Third Circuit distinguished *Sacks* because the *Sacks* opinion, in allowing depreciation deductions and investment

credits with respect to a sale and leaseback of solar energy equipment, reasoned that both Federal and State legislatures had specifically encouraged investment in solar energy and thereby "skewed the neutrality of the tax system." *Id.* at 106 (quoting *Sacks v. Commissioner*, *supra* at 991).

Respondent argues that *Sacks* does not control since, unlike the transaction in *Sacks*, the East Hall transaction and Historic Boardwalk Hall are shams because they had no appreciable effect on the parties' economic positions.

As an initial matter, we do not agree with respondent that Pitney Bowes invested in the Historic Boardwalk Hall transaction solely to earn rehabilitation tax credits. We believe the 3-percent return and the expected tax credits should be viewed together. Viewed as a whole, the Historic Boardwalk Hall and the East Hall transactions did have economic substance. Pitney Bowes, NJSEA, and Historic Boardwalk Hall had a legitimate business purpose—to allow Pitney Bowes to invest in the East Hall's rehabilitation.

Pitney Bowes invested in the East Hall rehabilitation. Most of Pitney Bowes' capital contributions were used to pay a development fee to NJSEA for its role in managing the rehabilitation of the East Hall according to the development agreement between Historic Boardwalk Hall and NJSEA. Respondent's contention that Pitney Bowes was unnecessary to the transaction because NJSEA was going to rehabilitate the East Hall without a corporate investor overlooks the impact that Pitney Bowes had on the rehabilitation: no matter NJSEA's intentions at the time it decided to rehabilitate the East Hall, Pitney Bowes' investment provided NJSEA with more money than it otherwise would have had; as a result, the rehabilitation ultimately cost the State of New Jersey less. Respondent does not allege that a circular flow of funds resulted in Pitney Bowes receiving its 3-percent preferred return on its capital contributions. In addition, Pitney Bowes received the rehabilitation tax credits.

Historic Boardwalk Hall and the AREA imposed financial requirements on both Pitney Bowes and NJSEA. Pitney Bowes was required to make capital contributions, and NJSEA was required to manage the East Hall's rehabilitation and assure its completion. If NJSEA failed in its role as manager and the rehabilitation did not proceed according to the parties' plan, Pitney Bowes would not be required to make additional cap-

ital contributions. This would have left NJSEA responsible for a larger portion of the East Hall's rehabilitation.

Respondent points to the parties' use of the term "sale of tax credits" and argues that the term "development fee" and the payment of a development fee by Historic Boardwalk Hall to NJSEA is merely meant to disguise evidence showing the true nature of the transaction to be a sale of tax credits. We must look to the substance of the transaction, rather than the terms used by the parties. The regulations clearly indicate that a development fee is a qualified rehabilitation expense. Sec. 1.48–12(c)(2), Income Tax Regs. The opinion letters obtained by NJSEA and Pitney Bowes all discuss whether a development fee is the type of rehabilitation expense that is eligible to earn rehabilitation tax credits, and whether the amount of the development fee at issue was reasonable in this type of rehabilitation. Respondent does not argue that any portion of the rehabilitation credits claimed is inappropriate or attempt to disallow any of Historic Boardwalk Hall's claimed credits on the ground that the development fee was not a qualified rehabilitation expense.

Pitney Bowes faced risks as a result of joining Historic Boardwalk Hall. First, and most importantly to its goals, it faced the risk that the rehabilitation would not be completed.

In addition, both NJSEA and Pitney Bowes faced potential liability for environmental hazards from the rehabilitation. Although Historic Boardwalk Hall and Pitney Bowes were added as named insured parties to NJSEA's environmental insurance, there was no guaranty that: (1) The insurance payout would cover any potential liability; and (2) if NJSEA was required to make up any difference, it would be financially able to do so.

Overall, respondent's argument that certain agreements prevented the East Hall transaction from affecting the partners' economic positions is incorrect. These side agreements and guaranties must be looked at in context: they were necessary to attract an equity investor. These provisions are meant to protect Pitney Bowes from any unforeseen circumstances that could arise as a result of problems with the rehabilitation. Respondent does not argue that the completion guaranty is a sham or is not a legitimate agreement between the parties. Instead, respondent argues that because Pitney Bowes' investment is limited to its capital contribu-

tions and because Pitney Bowes cannot be held responsible for additional funds to complete the East Hall rehabilitation, the East Hall transaction as a whole lacks economic substance. However, those agreements show that the East Hall and Historic Boardwalk Hall did in fact affect the parties' economic positions—the agreements were meant to prevent the transaction from having a larger impact than the parties had bargained for.

This is not a transaction in which the parties had competing interests that would work against the partnership's stated purpose. NJSEA and Pitney Bowes had a common goal: the rehabilitation of the East Hall. NJSEA needed the rehabilitation to be successful in order to make the East Hall an attractive site for concerts and events after the construction of the new convention center. Pitney Bowes needed the rehabilitation to be successful so it would earn rehabilitation credits and its 3-percent return. Both would receive a net economic benefit if the rehabilitation was successful.

The legislative history of section 47 indicates that one of its purposes is to encourage taxpayers to participate in what would otherwise be an unprofitable activity. Congress enacted the rehabilitation tax credit in order to spur private investment in unprofitable historic rehabilitations. As respondent notes, the East Hall has operated at a deficit. Without the rehabilitation tax credit, Pitney Bowes would not have invested in its rehabilitation, because it could not otherwise earn a sufficient net economic benefit on its investment. The purpose of the credit is directed at just this problem: because the East Hall operates at a deficit, its operations alone would not provide an adequate economic benefit that would attract a private investor. Further, if not for the rehabilitation tax credit, NJSEA would not have had access to the nearly $14 million paid to it as a development fee for its efforts in rehabilitating the East Hall. Considering that the cost of the rehabilitation was about $100 million, Pitney Bowes contributed about 15 percent of the cost of the rehabilitation.

Respondent attempts to read *Friendship Dairies, Inc. v. Commissioner*, 90 T.C. 1054 (1988), as holding that the investment tax credit is never taken into account in considering the economic substance of a transaction. *Friendship Dairies* does not make such a broad holding. Although we

held in that case that the investment tax credits at issue could not be taken into account in evaluating the economic substance of that transaction, we did not explicitly hold that investment credits are never taken into account when applying the economic substance doctrine. We stated that

"We acknowledge that many such tax-motivated transactions are congressionally approved and encouraged. * * * The determination whether a transaction is one Congress intended to encourage will require a broad view of the relevant statutory framework and some investigation into legislative history. The issue of congressional intent is raised only upon a threshold determination that a particular transaction was entered into primarily for tax reasons." [*Id.* at 1064 (quoting *Fox v. Commissioner*, 82 T.C. 1001, 1021 (1984)).]

In *Friendship Dairies*, we disregarded a sale-leaseback transaction which had no chance of profitability. This case is distinguishable on its facts.

Ultimately, NJSEA had more money for the rehabilitation than it would have had if Pitney Bowes had not invested in Historic Boardwalk Hall. Both parties would receive a net economic benefit from the transaction if the rehabilitation was successful. Pitney Bowes would earn a net economic benefit as a result of its entering into the East Hall's rehabilitation, while NJSEA would see higher revenues from other Atlantic City properties if the East Hall was a successful loss leader and began attracting large crowds after the rehabilitation was completed.

The rehabilitation of the East Hall was a success. Historic Boardwalk Hall has been operating and continues to operate day to day, with the East Hall being used as a convention facility. In conclusion, Historic Boardwalk Hall had objective economic substance.

IV. *Whether Pitney Bowes Was a Partner in Historic Boardwalk Hall*

Respondent next argues that Pitney Bowes was not a partner in Historic Boardwalk Hall. Respondent contends that Pitney Bowes' partnership interest should be disregarded because: (1) Pitney Bowes had no meaningful stake in Historic Boardwalk Hall's success or failure; and (2) Pitney Bowes' interest in Historic Boardwalk Hall is more like debt than equity. Ultimately, respondent's two argu-

ments both center on the fact that Pitney Bowes' return was limited to 3 percent.

Section 761(a) defines "Partnership" as follows:

SEC. 761(a). PARTNERSHIP.—For purposes of this subtitle, the term "partnership" includes a syndicate, group, pool, joint venture or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title [subtitle], a corporation or a trust or estate. * * *

Both petitioner and respondent point to *Commissioner v. Culbertson*, 337 U.S. 733 (1949), in support of their arguments. In *Culbertson*, the Supreme Court had to determine whether a valid partnership was formed. The Supreme Court listed several objective factors that influence the determination of whether a partnership is valid, including: (1) The agreement between the parties; (2) the conduct of the parties in executing its provisions; (3) the parties' statements; (4) the testimony of disinterested persons; (5) the relationship of the parties; (6) their respective abilities and capital contributions; (7) the actual control of income; and (8) the purposes for which the income is used. *Id.* at 742; see also *Va. Historic Tax Credit Fund 2001 LP v. Commissioner*, T.C. Memo. 2009–295. In *Va. Historic Tax Credit Fund*, we applied the *Culbertson* factors and upheld a partnership which was formed to allow the partners to share and distribute State tax credits.

In *Luna v. Commissioner*, 42 T.C. 1067, 1077–1078 (1964), this Court stated that "while all circumstances are to be considered, the essential question is whether the parties intended to, and did in fact, join together for the present conduct of an undertaking or enterprise", and cited *Commissioner v. Culbertson*, *supra* at 742, which stated:

The question is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard * * * but whether, considering all the facts * * * the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. * * *

Petitioner argues that Historic Boardwalk Hall is a valid partnership and that Pitney Bowes was a partner in that partnership. Petitioner points to the partnership agreement, the parties' actions in negotiating that agreement, and the parties' actions after the agreement was executed. Peti-

tioner contends that Pitney Bowes' extensive investigation of all aspects of the transaction and Historic Boardwalk Hall's business changes made after execution all support a conclusion that Pitney Bowes was a partner in Historic Boardwalk Hall.

We agree with petitioner. Pitney Bowes and NJSEA, in good faith and acting with a business purpose, intended to join together in the present conduct of a business enterprise. As we held above, Pitney Bowes and NJSEA joined together in a transaction with economic substance to allow Pitney Bowes to invest in the East Hall rehabilitation. Further, as we found above, the decision to invest provided a net economic benefit to Pitney Bowes through its 3-percent preferred return and rehabilitation tax credits. Combined with our above holding that Historic Boardwalk Hall had economic substance, it is clear that Pitney Bowes was a partner in Historic Boardwalk Hall.

The parties' investigations and documentation both support a finding that the parties intended to join together in a rehabilitation of the East Hall. Although the confidential offering memorandum used the term "sale", it was used in the context of describing an investment transaction. The confidential offering memorandum accurately described the substance of the transaction: an investment in the East Hall's rehabilitation.

The parties' investigation likewise supports a finding of an effort to join together in rehabilitating the East Hall. The parties investigated potential environmental hazards and attempted to mitigate them. This included two analyses by consulting firms and adding Historic Boardwalk Hall and Pitney Bowes as named parties to NJSEA's insurance policies. NJSEA and Pitney Bowes sought and received a number of opinion letters evaluating various aspects of the transaction.

The executed transaction documents accurately represent the substance of the transaction. The AREA is between Pitney Bowes and NJSEA and provides a detailed description of Historic Boardwalk Hall's purpose—to rehabilitate and manage the East Hall. Since formation, Historic Boardwalk Hall has carried out its goals. The AREA describes Pitney Bowes and NJSEA as members and also provides for transfers of their membership interests in later years. The development agreement between Historic Boardwalk Hall contractually obli-

gates NJSEA to manage the East Hall's rehabilitation and accurately represents the substance of the transaction.

Since execution of those agreements, the parties have carried out their responsibilities under the AREA. NJSEA oversaw the East Hall's rehabilitation, and Pitney Bowes made its required capital contributions. The East Hall was actually rehabilitated, did reopen to the public, and has been successful. This rehabilitation provided benefits to both Pitney Bowes and NJSEA.

Respondent again asks us to ignore the rehabilitation tax credits at issue. Pitney Bowes joined Historic Boardwalk Hall in exchange for its 3-percent preferred return and the rehabilitation tax credits. The 3-percent preferred return and the rehabilitation tax credits provided a net economic benefit to Pitney Bowes. Even if we do ignore the tax credits, Pitney Bowes' interest is not more like debt than equity because Pitney Bowes is not guaranteed to receive a 3-percent return every year. Because the East Hall operated at a loss each year, Pitney Bowes was not guaranteed the 3-percent return at the end of a given year because there might not be sufficient cashflow to pay it. In accord with the AREA, Pitney Bowes might not receive its preferred return until NJSEA purchased Pitney Bowes' membership interest, if at all.

Taking into account the stated purpose behind Historic Boardwalk Hall's formation, the parties' investigation of the transaction, the transaction documents, and the parties' respective roles, we hold that Historic Boardwalk Hall was a valid partnership.

V. *Whether the East Hall Was "Sold" to Historic Boardwalk Hall*

Respondent next argues that NJSEA did not transfer the East Hall to Historic Boardwalk Hall for Federal income tax purposes because NJSEA did not transfer the benefits and burdens of ownership.

Whether the benefits and burdens of ownership with respect to property have passed to the taxpayer is a question of fact that must be answered from the intentions of the parties as established by the written agreements read in light of the attending facts and circumstances. *Arevalo v. Commissioner*, 124 T.C. 244, 252 (2005), affd. 469 F.3d 436 (5th Cir.

2006); *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237 (1981). We look to the substance of the agreement and not just the labels used by the parties. *Arevalo v. Commissioner*, *supra* at 252. The following factors are considered: (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property. *Id.*

Respondent argues that the burdens of ownership remained with NJSEA because it bore all of the burdens of the East Hall's operation and rehabilitation, including remaining liable for the East Hall's operating expenses, real estate taxes, workers' compensation, and property and other insurance coverage and for completion of the East Hall rehabilitation. Respondent contends that NJSEA also remained responsible for any excess development costs, interest, taxes, and the costs of any environmental problems. Respondent concurrently argues that NJSEA maintained the benefits of ownership because it had the authority, through its purchase option, to purchase Pitney Bowes' interest in Historic Boardwalk Hall at any time. Respondent points to *Sun Oil Co. v. Commissioner*, 562 F.2d 258 (3d Cir. 1977), revg. T.C. Memo. 1976–40, and argues that under the Court of Appeals for the Third Circuit's authority, a purchase option requires a finding that the benefits and burdens were not passed.

Petitioner argues that the transaction documents clearly show the parties' intent to sell the East Hall to Historic Boardwalk Hall. Petitioner also argues that NJSEA had a contractual obligation to deliver the East Hall to Historic Boardwalk Hall, that Historic Boardwalk Hall had an obligation to pay for the East Hall, and that Historic Boardwalk Hall had possession of the East Hall.

Some of the factors weigh in favor of finding a sale: (1) The parties treated the transaction as a sale; (2) possession of the East Hall vested in Historic Boardwalk Hall; (3) Historic Boardwalk Hall reported the East Hall's profits and stood to lose its income if the East Hall stopped operating as an event

space. Others weigh against petitioner: (1) NJSEA remained liable for the East Hall's property taxes (2) because Historic Boardwalk Hall operated at a loss, NJSEA was not guaranteed to receive payments on the acquisition loan each year; (3) NJSEA could reacquire the East Hall by exercising its option under article 8.02 of the AREA.

We must evaluate whether the East Hall was transferred in the context of this specific rehabilitation transaction. We look at all the facts and circumstances surrounding the transaction at issue.

The East Hall has been operating as an event space, and all income and expenses of the East Hall have been reported on Historic Boardwalk Hall's Forms 1065. Bank accounts were opened in Historic Boardwalk Hall's name by SMG as operator of the East Hall.

Respondent argues that the benefits and burdens were not transferred because NJSEA remained liable for the rehabilitation and the expense of managing the East Hall. Respondent points to statements by NJSEA executives that the East Hall would operate in the same manner as it had before Historic Boardwalk Hall was formed and argues that these statements support a conclusion that the benefits and burdens were not transferred to Historic Boardwalk Hall. Respondent misinterprets the context of these statements. They were made in relation to NJSEA's decision to assign some of its construction contracts to Historic Boardwalk Hall. The statements appear to have been made to third parties and were meant to assuage the concerns of those third parties that their contracts and dealings with regard to the East Hall would be affected by the contract assignment to Historic Boardwalk Hall.

Respondent's additional argument in the context of the East Hall's ownership concerns the article 8.02 purchase option. Respondent points to *Sun Oil Co. v. Commissioner*, *supra*, and contends that in the Court of Appeals for the Third Circuit, a purchase option such as the one in article 8.02 requires a finding that the benefits and burdens of ownership remained with NJSEA. We do not believe that *Sun Oil* controls.

In that case, Sunray DX Oil Co. (Sunray) sold 320 parcels of land to a tax-exempt trust. Sunray then leased those parcels back. The Commissioner challenged Sunray's deductions

for lease payments. This Court found in favor of the tax-payer, but the Court of Appeals for the Third Circuit reversed our decision.

The Court of Appeals focused on Sunray's ability to recover the land "sold" to the tax-exempt trust. Sunray had a number of options if it decided it wanted to recover a specific piece of land. First, it could simply swap another piece of land for that land, without the trust's being able to reject it. Second, Sunray could make an offer to repurchase a specific piece of land. Lastly, Sunray had a right of repurchasing the land for an amount equal to the present value of rent payments due 60 years in the future, which would be an almost negligible value.

The Court of Appeals focused on how these provisions did not truly transfer any rights to the trust. The Court of Appeals observed that because Sunray could, without any restrictions, swap any piece of land for one subject to the sale-leaseback at issue, the offer provisions in the contracts were rendered moot. Further, the Court of Appeals held that because Sunray could always repurchase the land for an almost negligible amount by its repurchase options, it could always recover the land without paying the trust fair market value. The Court of Appeals stated: "The options to repurchase provide Sunray with a built in latch-string by which it could spring legal title to the properties whenever it served its convenience without obligating Sunray to pay fair market value." *Sun Oil Co. v. Commissioner*, 562 F.2d at 268.

As an initial matter, we note that *Sun Oil* is distinguishable on its facts. That case dealt with a sale-leaseback transaction entered into to generate artificial rent deductions. Further, we do not believe that the presence of a purchase option prevents our finding that the benefits and burdens of ownership of the East Hall were transferred to Historic Boardwalk Hall in the context of the rehabilitation tax credit.

A purpose of Historic Boardwalk Hall was to allow Pitney Bowes to invest in the rehabilitation of the East Hall and earn rehabilitation tax credits. The purchase option agreement gave NJSEA the right to purchase Pitney Bowes' membership interest in Historic Boardwalk Hall at any time during a 12-month period beginning 60 months after the

entire East Hall was placed in service for purposes of determining the historic rehabilitation credits. The rehabilitation credits of Pitney Bowes would have been subject to recapture had it disposed of its partnership interest within 60 months after the renovated East Hall was placed in service. See sec. 50; sec. 1.47–6(a)(1), Income Tax Regs. The statute demonstrates an anticipation of repurchase and creates a disincentive. Congress established a means to police early dispositions and created a deterrent to a premature buyout. For these reasons, NJSEA's purchase option was not contrary to the purpose of the rehabilitation tax credit.

In conclusion, we find that NJSEA transferred the benefits and burdens of ownership of the East Hall to Historic Boardwalk Hall.

## VI. *Respondent's Recasting of the Transaction*

Respondent alternatively determined in the FPAA that it was necessary to recast the East Hall transaction to "achieve tax results that are consistent with the intent of subchapter K." Section 1.701–2(b), Income Tax Regs., gives the Commissioner the authority to recast transactions for Federal income tax purposes if a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate Federal income tax liability in a manner that is inconsistent with subchapter K. Section 1.701–2(a), Income Tax Regs., provides that the following requirements are implicit in the intent of subchapter K:

(1) The partnership must be bona fide and each partnership transaction or series of related transactions * * * must be entered into for a substantial business purpose;

(2) The form of each partnership transaction must be respected under substance over form principles;

(3) * * * the tax consequences under subchapter K to each partner of partnership operations and of transactions between the partner and the partnership must accurately reflect the partners' economic agreement and clearly reflect the partner's income * * *

Requirement (3), however, contains an exception in certain situations. Some statutory and regulatory requirements imposed on partnerships by subchapter K may cause tax results that do not accurately reflect the partners' economic agreement or clearly reflect the partners' income, thus vio-

lating requirement (3) above. Section 1.701–2(a)(3), Income Tax Regs., provides that if a transaction satisfies requirements (1) and (2), requirement (3) will be treated as satisfied to the extent that the application of such a provision to the transaction and the ultimate tax results, taking into account all the relevant facts and circumstances, are clearly contemplated by that provision.

The determination of whether a transaction involving a partnership ought to be recast is made with consideration given to the statutory provision giving rise to the tax benefits and all pertinent facts and circumstances. Section 1.701–2(c), Income Tax Regs., provides a nonexclusive list of factors to be considered, including whether:

(1) The present value of the partners' aggregate Federal tax liability is substantially less than had the partners owned the partnership's assets and conducted the partnership's activities directly;

(2) The present value of the partners' aggregate Federal tax liability is substantially less than would be the case if purportedly separate transactions that are designed to reach a particular result are integrated and treated as steps in a single transaction * * *;

(3) One or more partners who are necessary to achieve the claimed tax results either have a nominal interest in the partnership, are substantially protected from any risk of loss from the partnership's activities * * *, or have little or no participation in the profits from the partnership's activities other than a preferred return that is in the nature of a payment for the use of capital;

(4) Substantially all of the partners * * * are related (directly or indirectly) to one another;

(5) Partnership items are allocated in compliance with the literal language of §§ 1.704–1 and 1.704–2, but with results that are inconsistent with the purpose of section 704(b) and those regulations * * * ;

(6) The benefits and burdens of ownership of property nominally contributed to the partnership are in substantial part retained (directly or indirectly) by the contributing partner (or a related party); or

(7) The benefits and burdens of ownership of partnership property are in substantial part shifted (directly or indirectly) to the distributee partner before or after the property is actually distributed to the distributee partner (or a related party).

Respondent argues that his decision to recast the East Hall transaction was correct because Historic Boardwalk Hall's principal purpose was to substantially reduce the present value of Pitney Bowes' aggregate tax liability in a manner inconsistent with the purpose of subchapter K.

Petitioner, however, contends that the East Hall transaction is wholly consistent with the purpose of subchapter K and further argues that the East Hall transaction is analogous to examples of the proper use of partnerships in section 1.701–2, Income Tax Regs. Section 1.701–2(d), Income Tax Regs., lists various factual situations involving the use of a partnership and evaluates whether that use is or is not consistent with the intent of subchapter K.

Section 1.701–2(d), *Example* (*6*), Income Tax Regs., involves the formation of a partnership by A and B, two high-bracket taxpayers, and X, a corporation with net operating loss carryforwards. A, B, and X form partnership PRS to own and operate a building that qualifies for section 42 low-income-housing credits. PRS is financed with cash contributions by A and B and nonrecourse indebtedness, and the partnership agreement provides for special allocations of income and deductions, including depreciation, to A and B equally. This allocation is consistent with the allocation of other economically substantial partnership items attributable to the building. The section 42 low-income-housing credits are also allocated according to the partnership agreement. The partners and partnership comply with all applicable partnership regulations in their management and reporting of the partnership. These include sections 1.704–1(b)(2)(ii) and (iii), 1.704–2(e), and 1.752–3, Income Tax Regs.

The ultimate result reached by the Commissioner is that individuals A and B are allowed to deduct their distributive shares of PRS' losses against their nonpartnership income and to apply the low-income-housing credits against their tax liabilities. Example (6) goes on to indicate that this allocation may not accurately reflect the partners' economic agreement or clearly reflect income. However, because the provisions that lead to this result, sections 1.704–1(b)(2)(ii) and (iii), 1.704–2(e), and 1.752–3, Income Tax Regs., clearly contemplated this result, then requirement (3), discussed above, is treated as having been satisfied.

The use of PRS results in partners A and B's aggregate Federal income tax liability being lower than if A and B had owned the building directly. This result flows from A and B's being able to use corporation X's otherwise allocable credits. Example 6 concludes that, even though the use of partnership PRS leads to this result, the PRS transaction is not incon-

sistent with the intent of subchapter K. As a result, the Commissioner cannot invoke section 1.701–2(b), Income Tax Regs., to recast the transaction.

Respondent disputes petitioner's reliance on Example (6) and argues that it is inapplicable. Respondent contends that Example (6) concerns a general partnership, unlike Pitney Bowes, NJSEA, and Historic Boardwalk Hall, where all partners have personal liability, none of the entities is tax exempt, section 42 does not require a profit motive, and the taxpayers are at risk if the building declines in value.

Respondent argues that Historic Boardwalk Hall violated section 1.701–2(a)(1), Income Tax Regs., because there was no substantial business purpose for its formation. Respondent points to certain factors listed in section 1.701–2(c), Income Tax Regs., and concludes that section 1.701–2(a)(1), Income Tax Regs., has been violated. These factors include Pitney Bowes' aggregate tax liability's being lower as a result of Historic Boardwalk Hall's creation; thus, Pitney Bowes is substantially protected from any risk of loss and has little or no participation in the partnership's profits other than its preferred return. Respondent does not argue a breach of requirement (1) or (2) of section 1.701–2(a), Income Tax Regs.

We have previously rejected respondent's contentions in the context of his other arguments. We agree with petitioner that respondent's decision to recharacterize the East Hall transaction pursuant to section 1.701–2(b), Income Tax Regs., was inappropriate. NJSEA and Pitney Bowes had the legitimate business purpose, as discussed above, of allowing Pitney Bowes to invest in the East Hall's rehabilitation. The use of a partnership was necessary to allow a for-profit corporation to invest in the rehabilitation of a government-owned building. Although Pitney Bowes' aggregate tax liability was reduced as a result of this transaction, Congress intended to use the rehabilitation tax credit to draw private investments into public rehabilitations.

Further, the regulations clearly contemplate a situation in which a partnership is used to transfer valuable tax attributes from an entity that cannot use them—corporation X—to individuals who can—taxpayers A and B. See sec. 1.701–2(d), *Example* (*6*), Income Tax Regs.

VII. *Section 6662 Accuracy-Related Penalty*

Respondent determined in the FPAA that Historic Boardwalk Hall should be liable for the accuracy-related penalty pursuant to section 6662. Because we find respondent's other determinations to be incorrect, the section 6662 penalty is inapplicable.

VIII. *Conclusion*

Respondent's determinations in the FPAA were incorrect. To reflect the foregoing,

*An appropriate decision will be entered.*