T.C. Memo. 2015-28

UNITED STATES TAX COURT

436, LTD., ROBERT HEITMEIER, TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23525-05.                          Filed February 18, 2015.

Kyle R. Coleman, for petitioner.

Richard J. Hassebrock, Nancy B. Herbert, and Gary R. Shuler, Jr.,

for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, Judge:  This case comes to us from a riverboat casino on the

lower Mississippi.  In 1991 Robert Heitmeier saw a lucrative opportunity in the

newly legalized riverboat-gambling industry of New Orleans.  He started several

[*2] businesses to provide crews and consulting services to these new casinos, and in 2001 Heitmeier hit the jackpot when Harrah's purchased his piloting contract with the Showboat Casino for $4 million. He reported an additional $142,000 of ordinary income from his consulting services, and $232,000 of ordinary income from his services in providing crews. He took a chance to try to lower his tax bill with a complicated series of transactions involving multiple entities and almost perfectly offsetting bets on Japanese yen.

The Commissioner aims to sink his shelter.

## FINDINGS OF FACT

I.     The Deckhand Turned Millionaire

Robert "Bobby" Heitmeier left college after only one semester to work as a deckhand on a tugboat. He rose to become a captain and then a riverboat pilot. Riverboat pilots and captains ought not to be confused. A captain is almost always in command of the ship, except when it goes into a lock system or a drydock. Captaining is good work, but piloting--ah, "a pilot, in those days, was the only unfettered and entirely independent human being that lived in the earth."[1]

---

[1] Mark Twain, Life on the Mississippi 105 (Harper & Bros. Publ'g 1901) (1883), available at http://books.google.com/books?id=5IRaAAAAMAAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false.

**[\*3]** Pilots guide ships through congested harbors and ports using their intensely local knowledge of maritime conditions. This comes at a price, and even in antebellum America pilots earned a "princely salary." See id. at 34. Nowadays a pilot doesn't even have to take the wheel--though his job remains to direct the ship and monitor the course of his ship and others around it. Modern navigational technology has not relieved shippers of the need for pilots in many places, including the lower Mississippi, where state law requires their use and does not allow open entry into the field.[2] Heitmeier is savvy and successfully navigated his course to a piloting license from Louisiana in 1989. In 2001 he was also licensed as a river pilot by the U.S. Coast Guard.

---

[2] The Louisiana Code has a title devoted to navigation and shipping, and within that title, a section dedicated to pilots. La. Rev. Stat. Ann. secs. 34:941 *et seq.* (2011). All section references are to the Internal Revenue Code in effect for the year in issue, unless otherwise indicated. These statutes require that all seagoing vessels moving between New Orleans and other ports be navigated exclusively by pilots who are State officers. These pilots are so-called river port pilots and can gain certification by the State Board of River Pilot Commissioners-- also pilots--only after performing an obligatory six-month apprenticeship with an incumbent pilot. Obtaining an apprenticeship is no easy task. Incumbent pilots have almost unfettered discretion under the law to select prospective apprentices–and piloting is one of the very few jobs in which state-sanctioned nepotism has survived constitutional challenge. See Kotch v. Board of River Port Pilot Comm'rs, 330 U.S. 552, 555 (1947) (nepotism in pilot selection does not violate Equal Protection Clause).

[*4]   The City of New Orleans has been a major world port for nearly three centuries.  The Louisiana legislature has controlled the activities and appointment of pilots since before the territory was admitted as a state.  In 1991 the state approved fifteen new riverboat casinos.  Heitmeier shrewdly saw that as a business opportunity--gambling people knew Vegas, but they weren't "going to know anything about a boat"--so he set up a business to provide maritime crews to the new casinos.  Each riverboat needed about sixty of Heitmeier's employees, roughly four crews per ship, who could work 12-hour-long, 7-day-on, 7-day-off shifts.  This work soon became less than arduous, as the boats quickly stopped actually cruising on the river and became attached as firmly as barnacles to the docks.  (Though sometimes they docked on a ditch filled with river

[*5] water--"boats in moats" as they are called.)[3] Heitmeier incorporated that business as Riverboat Services, Inc., in 1995 and was its sole shareholder.

Heitmeier also formed two other businesses around the same time for his riverboat-related activities--Westbank Riverboat Services, Inc., and BRK Consulting, LLC. Heitmeier used Westbank to supply workers to the riverboat casinos, and did his own consulting work through BRK Consulting. Heitmeier reported more than $230,000 of income from Westbank for 2001. He shared

---

[3] This practice of manning a full crew on boats that never leave the shore is the result of state-law technicalities restricting gambling (apart from American Indian casinos and one land-based casino) to "riverboats." Louisiana's statute says that "the division may issue up to fifteen licenses to conduct gaming activities on a *riverboat*, in accordance with the provisions of this Chapter." Louisiana Riverboat Economic Development and Gaming Control Act, La. Rev. Stat. Ann. sec. 27:65 (emphasis added). The statute defines a riverboat, in part, as a vessel that "[c]arries a valid Certificate of Inspection (COI) from the United States Coast Guard for the carriage of a minimum of six hundred passengers and crew." Id. sec. 27:44(23)(b). Thus, while Louisiana and other states on the Mississippi that allow riverboat gambling have eliminated the requirement that the boats actually move, see, e.g., id. sec. 27:65(B)(1)(c), casino boats must meet Coast Guard requirements to receive a COI. The Coast Guard specifies in the COI the minimum crew requirements for a boat, and it bases this determination on factors such as the size of the boat, the number of passengers, and its intended use. 46 C.F.R. sec. 15.501. The determination is fact specific for each boat, but Coast Guard guidelines suggest that Heitmeier's staffing decisions were not out of the ordinary. See, e.g., The U.S. Coast Guard, Marine Safety Manual Vol. III: Marine Industry Personnel, B2-7 (2014), *available at* http://www.uscg.mil/directives/cim/16000-16999/CIM_16000_8B.pdf. This has struck some observers as absurd, but it created a lucrative opportunity for those shrewd enough to take advantage of it.

[*6] ownership of BRK with his wife, and they each reported more than $70,000 of income from it for 2001.  By October 2001 he had about $1 million invested in various Merrill Lynch accounts.

In 2001 Harrah's bought the Showboat Casino, one of Riverboat Services' clients.  Harrah's wanted to take its piloting in-house and approached Heitmeier to buy out Riverboat Services' contract with Showboat.  Heitmeier represented himself and dickered with Harrah's over the price for a while before calling in KPMG to settle things with a valuation.  KPMG came up with a value, and the former deckhand sold his contract for a $4 million payday.

II.     Enter Mr. Garza

Joe Garza is an attorney from Dallas, Texas, who had a long-established practice in insurance defense, ERISA, and bond financing before he moved into tax planning--sometimes quite aggressive tax planning.  See 6611 Ltd. v. Commissioner, T.C. Memo. 2013-49; Garcia v. Commissioner, T.C. Memo. 2011-85, 2011 WL 1404919; Estate of Hurford v. Commissioner, T.C. Memo. 2008-278, 2008 WL 5203652; 7050, Ltd. v. Commissioner, T.C. Memo. 2008-112, 2008 WL 1819920.  It was Garza who sold Heitmeier on something he hadn't heard of

**[*7]** before--a variant of the now notorious Son-of-BOSS deal using digital options and Japanese yen.[4] See Kligfeld Holdings v. Commissioner, 128 T.C. 192, 194 (2007).

A.    The Approach

Around 1999 Garza first became aware of Son-of-BOSS transactions--a law firm named Jenkens & Gilchrist was doing a lot of them, and several of his clients wanted to do them too.  Garza concluded that he could either refer his interested clients to Jenkens & Gilchrist or do the deals himself.  He decided to learn how to do the deals himself.

First he consulted with Craig Brubaker--an ex-Arthur Andersen employee and at the time a director at Deutsche Bank Alex Brown.  Brubaker had been working on a lot of these deals for Jenkens & Gilchrist, and Garza was confident of Brubaker's knowledge and abilities.  Brubaker gave Garza some information on how these deals worked and how much Deutsche Bank charged for them.

---

[4] Garza wasn't really urging a speculative foray in foreign currency--he was promoting a type of Son-of-BOSS tax shelter (which is a variant of the Bond and Options Sales Strategy (BOSS) shelter) that uses European digital options on foreign currency.  Unlike an "American" option, which can be exercised at any time before it expires, a "European" option can be exercised only at a particular date and time.  An option is "digital" if it has the same payout no matter how far in the money it is.  Digital options are also known as "all-or-nothing" options.  See Markell Co. v. Commissioner, T.C. Memo. 2014-86, at *4 n.5.

**[*8]**  Brubaker also suggested that Garza speak with another lawyer rumored to have done a $100 million transaction for a local billionaire who "seemed to know what he was doing," to learn more.  Garza followed Brubaker's recommendation and paid the lawyer $50,000 for a dark-side CLE on the finer points of the deal.  Included in the bargain was a turnkey opinion letter--one that Garza could use in his own practice.  Part of Garza's promotional pitch was that if a taxpayer had a "good" tax opinion letter, he would not have to pay any penalties even if the tax benefits were disallowed.

Once Garza had his turnkey opinion letter and knew the transaction well enough, he began pitching.  The purpose of all Son-of-BOSS tax shelters is to create "artificial tax losses designed to offset income from other transactions." Kornman & Assocs., Inc. v. United States, 527 F.3d 443, 446 n.2 (5th Cir. 2008). Garza's scheme involved a partnership to which his clients would transfer assets and liabilities.  As a matter of economics, the liabilities would offset the value of the assets, but those liabilities wouldn't be completely fixed at the time of transfer, and the purported partners would ignore them in calculating their outside bases in that partnership.  The partnership would also ignore the liabilities in computing its

[*9] inside bases in the contributed property.[5]  Ignoring the liabilities in calculating basis creates an inflated basis.  When the purported partners liquidated their partnership interests, they would get a distribution of property to which they would attach this high basis in the partnership.  And then when they sold that property, it would produce large tax--but not out-of-pocket--losses.  See, e.g., Markell Co. v. Commissioner, T.C. Memo. 2014-86, at *12, *31 n.17.

Garza used a six-step deal:

- buy a foreign-currency call option (and sell an offsetting foreign-currency call option in the same currency to the same counterparty)[6] and also Canadian dollars through a single-member LLC;

- form a partnership with a third party or wholly owned LLC;

- contribute the foreign-currency options and Canadian dollars to the partnership;

---

[5] Inside basis is the basis a partnership has in its own assets, sec. 723; outside basis is the basis a partner has in his partnership interest, sec. 722; sec. 1.722-1, Example (1), Income Tax Regs.

[6] We refer elsewhere in this opinion to such options as "long options" and "short options."  "Long" can mean several things in finance-speak; here, it simply means to buy and hold a position.  "Short" likewise has multiple meanings:  Here, it means to sell a position.  Because the long and short legs in the option transactions involved the same parties, the same periods, and the same counterparties, they economically zeroed each other out except for the narrow spread between the two strike prices:  One party could buy the yen at $X from the second party, and the second party could turn around and buy the yen at $X minus the spread from the first party.

[*10] • recognize a gain or loss by the partnership when the options expired or were exercised;

• terminate and liquidate the partnership; and

• sell the Canadian dollars that the single-member LLC received from the partnership's liquidation.

Garza credibly testified to having sold over a dozen of these types of transactions to different taxpayers.

Garza says he would always have his clients choose which currency to use but would make strong recommendations. He would also insist that each of his clients talk with Brubaker. Brubaker would explain what trades would be made, answer other questions, and help the client set up Deutsche Bank accounts. If the client asked Garza what he thought, he would say something encouraging like "I think the yen is going downhill" and proceed from there. We also note especially that Garza never negotiated any of the investment details for his clients. He let Brubaker and Deutsche Bank value the options.

B.      Garza Spreads to New Orleans

Heitmeier was happy about his windfall, but worried about the possible tax bill. He was especially worried that the tax due would be at "regular" (i.e., ordinary) rates, so he called his tax adviser, Walter Jones. Heitmeier and Jones went way back--Heitmeier's longtime CPA, Hank LeVierre, was Jones' former

**[*11]** business partner, and Heitmeier and Jones had grown up together, their fathers had grown up together, and Heitmeier's brother had even dated Jones' sister. When LeVierre retired, Jones took over Heitmeier's accounting and prepared the returns for Heitmeier's three businesses. Jones wasn't involved in the day-to-day operations, but a week after Heitmeier told him about the sale proceeds, Jones proposed he meet with a colleague, Ellis Roussel, to discuss "something different, something going on right now." Roussel worked for the firm LeGlue & Company CPAs, which had its offices in the same building as Jones' in New Orleans, and Jones often handed off bigger jobs to them.

Roussel first learned about the Son-of-BOSS deal in September 2001 from one Edward Turner, a Texas CPA who did peer reviews of LeGlue & Company's work.[7] Turner didn't go into great detail with Roussel at that point, but just gave Roussel a brief description of the deal and said he'd done it with good results in

---

[7] To be a member of the American Institute of CPAs (AICPA), public accounting firms must be enrolled in a practice-monitoring (or "peer review") program. The AICPA requires accounting firms to have an independent evaluator review their accounting and auditing practices generally every three years. See American Institute of Certified Public Accountants, Inc., 2013 Peer Review Program Manual: AICPA Standards for Performing and Reporting on Peer Reviews sec. 1000(.01)-(.03) (2013), available at http://www.aicpa.org/Research/Standards/PeerReview/DownloadableDocuments/2013MarPeerReviewStandards.pdf

[*12] the past.  Once Jones got wind of the deal, and told Roussel he had someone who might be interested, Heitmeier met with the two of them to discuss the opportunity.  During the meeting, Heitmeier didn't understand the details of the contemplated transaction, but he was certainly intrigued by the potential for tax benefits.  He later contacted Roussel to say he wanted to move forward.

C. <u>Heitmeier Meets Garza</u>

At some point Roussel contacted Turner again, and Turner sent him an opinion letter written by Jenkens & Gilchrist for another client who had done a Son-of-BOSS deal and then put him in touch with Garza.  Heitmeier first spoke with Garza in a conference call with Roussel and Garza.  During the call Garza described each step of the deal.  A few weeks later he came to New Orleans to eat étouffée and pitch Heitmeier at the LeGlue offices.  At this meeting, Garza provided Heitmeier with written materials that outlined the deal.  Garza "[s]poke a lot in generalities, [and] went through some items pretty fast."  Roussel was getting more comfortable with the deal's mechanics but still "certainly didn't have a total grasp on it."  But Heitmeier's big takeaway from this meeting was that the transaction might double his initial outlay of $40,000 if the Japanese yen moved one way, and in any event would gain for him a "significant write-off" for tax purposes.

**[*13]** Around the same time he was learning about the deal from Garza, Roussel also pulled in other people to do some independent research. Vince Giardina, another LeGlue partner, researched the tax aspects of the deal. Roussel also called Brian Leftwich, a New Orleans tax attorney who often acted as counsel for LeGlue. The more they learned, the more they fretted. Roussel, Giardina, and Leftwich were all concerned about the deal's lack of profit motive and gossamer economic substance. Roussel refused to make any recommendation regarding whether Heitmeier should participate in the transaction, and told Heitmeier, "Listen, we can't give you an opinion that you can do it; we can't--* * * there's some indications, you know, that may raise some questions." Giardina also refused to bless the arrangement and alerted Heitmeier that he might be exposed to an audit if he chose to proceed. And Leftwich ultimately decided that he didn't feel comfortable giving an opinion either way--he wasn't well-versed in foreign-currency options. Despite these warning signs, in late October 2001, Heitmeier decided to follow Garza and go forward with the Son-of-BOSS transaction.

D. The Deal That Was Done

Garza charged Heitmeier a flat fee of $135,000 for his services. The bill that Garza sent to Heitmeier was entitled "Statement for Services Rendered," and

[*14] said it covered "all services to be rendered in connection with your digital option transaction and the related legal opinion," including:

- formation of LLC disregarded entity;

- formation of limited partnership;

- negotiations with investment bank and review of transactions;

- legal opinion letter; and

- tax return preparation and review.[8]

It also said that the $135,000 would cover "any and all services necessary in the event that either you or the above entities are selected for an audit by the IRS in the future." This meant that Garza would cover their legal fees if the transaction blew up.

Garza required Heitmeier to pay the first installment of $67,500 upon receipt of his "Statement for Services Rendered," and the remaining $67,500 when he delivered his legal opinion. Heitmeier paid the first installment on October 30, 2001 from a Hibernia Bank account opened in the name of Riverboat Services, Inc.

Heitmeier knew that the entities were created to capture the tax benefits of the digital option/Japanese yen transaction, and that the transaction had to be

---

[8] Garza would occasionally review returns, but he did not prepare them.

[*15] completed by 2001 for him to capture the tax benefits. He relied entirely on Garza to prepare the paperwork and file the necessary documents with the different state authorities, and didn't bother to obtain any investment or financial advice about the transaction from his investment broker at the time. Garza moved quickly. He set up in Colorado and Georgia because those states processed filings quickly and cheaply. He named the entities with numbers because he wanted to avoid any snags that might have slowed the deal if someone else had an LLC or partnership with the same name. And Garza didn't draft any of the entity agreements from scratch, but adapted them from the sample he already had. The documents Heitmeier actually signed, he signed without reading. Other documents were signed on his behalf as Robert Heitmeier PA, even though Heitmeier had not designated or authorized anyone to act on his behalf.

Garza launched the Heitmeier transaction on October 29, 2001 and things took off:

- From October 29 to 30, 2001, Garza helped Heitmeier form three entities: 8252, LLC, 94 LLC, and 436, Ltd.

**[*16]**

- 8252 is a disregarded entity for federal tax purposes, was formed under Georgia law, and Heitmeier is listed as its sole member.[9]

- 94 was formed as a Colorado limited liability company, Heitmeier was its sole member, and it never made an election on Form 8832 to be classified as an association for federal tax purposes.

- 436 was formed as a Colorado limited partnership, and on its 2001 return it listed Heitmeier as a 99% limited partner, and 94 as a general partner with a 1% limited-partnership interest.

- On October 29, 2001, Heitmeier set up three accounts with Deutsche Bank--one for Riverboat Services, one for 8252, and one for 436.

- On October 30, 2001, Heitmeier had Riverboat Services send $45,000 to 8252's Deutsche Bank account. This was the only capital contribution made to 8252.

- On October 30, 2001, Heitmeier also had Riverboat Services send $67,500 to Garza's account at Bank One--half his total fee.

- On November 1, 2001, 8252 bought and sold offsetting long and short foreign-currency options on Japanese yen from Deutsche Bank for a $40,000 net premium.[10] Both options expired on December 12, 2001.

---

[9] A U.S. business entity with only one member is either a corporation or a "disregarded entity." (When an entity is "disregarded", it means that its owner is treated under the Code as a sole proprietor. Sec. 301.7701-2(a), Proced. & Admin. Regs.) If it doesn't want to be disregarded, Form 8832, Entity Classification Election, allows the entity to elect to be taxed as a corporation. Sec. 301.7701-3(b)(1)(ii), (c)(1)(i), Proced. & Admin. Regs.

[10] The premiums on the long and short positions were $4 million and $3,960,000, respectively.

[*17] • On December 3, 2001, 8252 transferred both the long and short options to 436 in exchange for $10 "and other good and valuable consideration."

• On December 4, 2001, 8252 paid $4,000 to buy Can $6,207.20.

• On December 10, 2001, the options were in the money with only two days left before their expiration.  Heitmeier accepted Deutsche Bank's offer to cash him out for $50,000, which he deposited into the Deutsche Bank account for 436.

• On or about December 24, 2001, 8252 transferred the Can $6,207.20 to 436.

• On December 19, 2001, Heitmeier asked Deutsche Bank to transfer $50,000 from 436's account to an account for Garza & Staples--the second half of Garza's legal fees.  Garza asked that the remaining $17,500 be wired to the account of Garza & Staples with Bank One, Texas.

• On December 26, 2001, Heitmeier assigned the Canadian dollars held by 436 to 8252.  According to 436's and 8252's Deutsche Bank account statements, however, that assignment was never consummated.

• On January 4, 2002, 436 transferred the same Can $6,207.82 to Riverboat Services.

• On December 31, 2001, Riverboat Services sold Can $6,207.82 for $3,848.40, which was deposited into Riverboat Services' Deutsche Bank account.

• On December 31, 2001, a Cancellation of Domestic Certificate of Limited Partnership was filed in Colorado for 436.

**[\*18]** The parties stipulated that 8252, 94, and 436 didn't conduct any activities other than these foreign-currency trades. For both 94 and 436, Heitmeier provided a business address in Colorado Springs, Colorado, even though he had no connection with Colorado. The partnership agreement for 436 was a *pro forma* agreement that Garza used. Garza testified that it contained several incorrect statements, such as a reference to a prior partnership agreement, an arbitrary termination date, and activities that the partnership would engage in (e.g., farming and ranching, buying and leasing oil, and purchasing and selling machinery).

As we've already noted, Heitmeier had by this time amassed a sizable Merrill Lynch brokerage account--about $1 million. But before November 2001 Heitmeier had never invested in foreign currency. His investment adviser, Lance Giambelluca, credibly said that Heitmeier had invested mostly in tech stocks and been burned by the stock market crash of early 2000. Heitmeier had at one time discussed another derivatives product called a "covered call" with Giambelluca, but he never bought in.

III.    Reporting the Transactions

    A.    Garza's Opinion

Garza sent an opinion letter to Heitmeier dated December 30, 2001. The letter had about four pages of facts supposedly describing the transaction and over

**[\*19]** 80 pages of boilerplate language on tax-law doctrines--running the gamut from partnership-basis rules to treatment of foreign-currency contracts, the step-transaction doctrine, economic substance, disguised-sale provisions, and partnership anti-abuse regulations. The letter also concluded that the tax treatment Garza proposed would "more likely than not" withstand IRS scrutiny.

Garza, however, relied on certain "facts" to reach his "more likely than not" conclusion, and these "facts" were just plain wrong. Here are some of the key mistakes he made in the factual recitation section--the first four pages of each opinion:

- The opinion states that Heitmeier's transaction involved options on Canadian dollars, even though the options were on Japanese yen.

- The opinion states that Heitmeier made the listed representations, but he didn't. Garza made up the representations on his own.

- The opinion letter states that Heitmeier "believed there was [a] reasonable opportunity to earn a reasonable pre-tax profit from the transactions * * * (not including any tax benefits that may occur), in excess of all the associated fees and costs." But Garza's $135,000 fee was ignored in reaching that conclusion. The opinion doesn't mention Garza's fee at all.

And here are some of the key factual mistakes made in the opinion letter's discussion section, on which Garza based key legal conclusions:

- The purchased (long) and sold (short) options had their own confirmations.

[*20]     •     The long and short options were the subject of the same confirmation.

•     The partnership had to deliver foreign currency if the short option was exercised.

•     The partnership had no obligation to deliver foreign currency.

•     As of the date of the opinion, the options had not yet expired--so it was uncertain whether the partnership would have to satisfy its obligation regarding the short option.

•     When Garza sent out the opinion letters, the obligations under the option contracts were by that time certain.

•     None of the partnerships' (i.e., 436's, 94's, and 8252's) partners were related.

•     The partners of each partnership were related--Heitmeier was the 99% limited partner, and his wholly owned and controlled 94 was the 1% general partner.

•     The assets contributed by a partner (Heitmeier) would not be the same assets distributed to that partner.

•     The Canadian dollars distributed were the same ones contributed by the partner.

If Garza was making up facts for his opinion letter, Heitmeier wouldn't have noticed because he never reviewed the facts in the opinion for accuracy, or even asked for any clarification. Garza credibly testified that he had several conversations with Heitmeier and Roussel but that they never brought up--let alone asked him to correct--any mistakes in the opinion. The letter, for all its

[*21] length, also lacks even a mention of one very important document--Notice 2000-44, Tax Avoidance Using Artificially High Basis, 2000-2 C.B. 255, which the Commissioner published on September 5, 2000--even though Garza knew about it when he provided the legal opinion to Heitmeier.

B.    What Was Reported

Jones prepared the 2001 return for Riverboat Services, Inc., an S corporation,[11] by filing Form 1120S, U.S. Income Tax Return for an S Corporation.  Riverboat Services claimed a "section 988 Currency Loss" of nearly $4 million.  The claimed loss then passed through to the Heitmeiers' 2001 joint return, which Jones also prepared, and substantially offset the $4.7 million in income passed through from Riverboat Services to the Heitmeiers.

Giardina prepared 436's partnership return for Heitmeier to sign.  The partnership reported no income or loss for 2001.  On its partnership return for the year 436 reported partner capital contributions of $4,187,593, consisting of the $4 million notional amount of the long option; plus $3,990 for the purchase of the Canadian dollars; $50,000 capital contribution; $85,000 in attorney's fees; and about $49,000 in accounting fees.  While 436 treated the notional amount of the

_____

[11] An S corporation is a corporation governed under the laws of subchapter S of the Internal Revenue Code.  C corporations are governed by subchapter C, and partnerships by subchapter K.

[*22] $4 million long-option premium as a capital contribution, it did not report the liability inherent in the notional $3,960,000 short-option premium. The partnership return also reported offsetting partnership distributions of property other than money of $4,187,593, which resulted from treating the notional amount of the $4 million long-option premium as a contribution that would be distributed upon the liquidation of 436. It did not, however, take into consideration the liability inherent in the $3,960,000 short-option premium. Both the capital contributions and partnership distributions were allocated $4,145,717 to Heitmeier and $41,876 to 94 LLC on the Schedules K-1.

But remember that by this time the options had long since been cashed out, so the supposed basis in the long option can theoretically be attached to the only noncash (i.e., non-American cash) asset 436 had left--the Can $6,207.82. By reporting this $4,187,593 as a "distribution of property," Giardina was effectively reporting it as 436's basis in that property.

IV. Prelude

The Commissioner audited 436's return under TEFRA and issued a notice of final partnership administrative adjustment (FPAA) to 436 in September 2005.[12]

---

[12] TEFRA is the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, 96 Stat. 324, one part of which governs the tax

(continued...)

**[*23]** The FPAA adjusted 436's capital contributions and distributions to zero and determined accuracy-related penalties under section 6662.

The FPAA Schedule of Adjustments did not *adjust* Heitmeier's or 94's outside bases, but in the "Exhibit A-Explanation of Items" sent to 436, the Commissioner did make *determinations* about outside basis, including the determination that the partners have not "established that the bases of the partners' partnership interests were greater than zero." This may or may not have been sufficient to put outside basis at issue here, cf. Clovis I v. Commissioner, 88 T.C. 980, 982 (1987), but the Commissioner later conceded that the FPAA did not adjust outside basis. Unlike a concession on a point of law regarding whether we

---

[12](...continued)
treatment and audit procedures for most partnerships. See TEFRA secs. 401-406, 96 Stat. at 648-670. TEFRA partnerships are subject to special tax and audit rules. See secs. 6221-6234. Each TEFRA partnership, for example, is supposed to designate a tax matters partner (TMP), to handle the partnership's administrative issues with the IRS and any resulting litigation. TEFRA requires the uniform treatment of all "partnership items"--a term defined by section 6231(a)(3) and (4)-- and its general goal is to have a single point of adjustment for the IRS rather than having it make separate partnership item adjustments on each partner's individual return. See H. Conf. Rept. 97-760, at 599-601 (1982), 1982-2 C.B. 600, 662-63. If the IRS decides to adjust any partnership items on a partnership return, it must notify the individual partners of the adjustment by issuing an FPAA. Sec. 6223(a). An FPAA generally includes: (1) a notice of final partnership administrative adjustment, (2) Form 870-PT, Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts, including a Schedule of Adjustments, and (3) an "Exhibit A--Explanation of Items," listing the Commissioner's other adjustments or determinations.

**[\*24]** have jurisdiction over outside basis at the partnership level, see Tigers Eye

Trading LLC v. Commissioner, 138 T.C. 67, 74 (2012), appeal filed (D.C. Cir.

Mar. 9, 2012), the Commissioner's concession here simply notes that these

particular FPAAs were not adjusting outside basis and that he wasn't seeking a

determination of outside basis in this partnership-level proceeding. While we are

always required to satisfy ourselves that we have jurisdiction before entering a

decision, see Gray v. Commissioner, 138 T.C. 295, 297 (2012), we don't have to

reach out and put into play issues the parties don't seek to adjudicate. In Tigers

Eye Trading we had to determine whether we had jurisdiction because the

taxpayer argued that we lacked it. But we agree with the Commissioner that

outside basis isn't at issue here.

Instead, like 6611, this case is about an inside-basis Son-of-BOSS deal--the

inflated basis was attached to an asset that the partnership held and then

distributed to a partner who sold it for a supposed loss.[13] As in other Garza-

---

[13] The usual rule is that an asset distributed by a partnership to one of its partners has a basis equal to the *partnership*'s basis in that very asset. Sec. 732(a). Inside-basis Son-of-BOSS deals claim to be able to transfer basis within the partnership from one asset to another via section 732(b). See 7050, Ltd., T.C. Memo. 2008-112. Under section 732(b), a partner takes a transferred basis in the distributed property the same as his outside basis in the putative partnership interest (minus any cash received). The parties here agree that the claimed tax benefits come from the disposition of an asset formerly held by a putative

(continued...)

**[\*25]** inspired transactions, see, e.g., 106 Ltd. v. Commissioner, 136 T.C. 67, 73 (2011), aff'd, 684 F.3d 84 (D.C. Cir. 2012); 6611, Ltd v. Commissioner, T.C. Memo. 2013-49; 7050, Ltd. v. Commissioner, T.C. Memo. 2008-112, the inflated basis lay in foreign currency (in those cases, Canadian dollars) and the aim is to try to have those basis-bloated Canadian dollars distributed to a partner who can then treat them as a reservoir of ordinary loss, dipped into as necessary by selling them for a massive tax loss.

One distinction between inside-basis and outside-basis Son-of-BOSS deals is that there is a conflict among courts about whether outside basis is a partnership item. See Petaluma FX Partners, LLC v. Commissioner, 591 F.3d 649, 654 (D.C. Cir. 2010), aff'g in part, rev'g in part, vacating and remanding on penalty issues 131 T.C. 84 (2008); Tigers Eye Trading, 138 T.C. at 115-28. The Commissioner usually wants a penalty in both types of cases, so whether an item is a "partnership item" then affects whether a penalty "'relates to an adjustment to a partnership item.'" See United States v. Woods, 571 U.S. __, __, 134 S. Ct. 557, 563-64 (2013) (quoting section 6226(f)); Tigers Eye Trading, 138 T.C. at 139-42.

---

[13](...continued)
partnership, not the disposition of a partner's interest in that partnership.

**[*26]** We happily avoid those disputes here.  The Commissioner does want penalties in this case, and the FPAA Explanation of Items determined that

> [A]ll of the underpayments of tax resulting from [the] *adjustments of partnership items* are attributable to, at a minimum, (1) substantial understatements of income tax, (2) gross valuation misstatement(s), or (3) negligence or disregarded rules or regulations. * * * It is therefore determined that, at a minimum, the accuracy-related penalty under Section 6662(a) of the Internal Revenue Code applies to all underpayments of tax attributable to *adjustments of partnership items* of 436, LTD.  [Emphasis added.]

The Explanation of Items went on to determine a 40% gross-valuation-misstatement penalty or, barring that, a 20% substantial-valuation-misstatement penalty.  In the alternative, it asserted either a 20% penalty for negligence, disregard of rules and regulations, or substantial understatement of income tax.  In response 436 raises only the defense that it had reasonable cause and acted in good-faith reliance on professional advice.[14]  The Commissioner has reiterated that he does not seek a penalty related to Heitmeier's outside basis in the partnership; he seeks it related to the inflated contributions to, and distributions from, the partnership--a partnership's basis in an asset is usually its basis in the hands of the partner who's contributing that asset, sec. 723, and the basis of an asset other than

---

[14] They could have, but have not, argued that the imposition of penalties was somehow otherwise defective.  While we must satisfy ourselves about our own jurisdiction, we deem 436 to have waived any other counterargument regarding the imposition of penalties apart from reasonable cause and good faith.

[*27] money (and that means American money) distributed to a partner is usually the partnership's basis in that asset, see sec. 732(a). There were plenty of other issues, and Heitmeier, in his role as tax matters partner for 436, filed a timely petition.[15] We tried the case partly in Dallas, and then tried to take testimony from one witness via video uplink.[16]

## OPINION

I.    Jurisdiction

Partnerships do not pay income tax, but they do file information returns, and partners are supposed to use the numbers from those returns on their own individual returns. See secs. 701, 6031, 6222(a). While 436 was a partnership subject to audit under TEFRA, our jurisdiction at the partnership level is limited under TEFRA to

> *partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment relates*, the proper allocation of such items among the partners, and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item.

---

[15] 436 was a defunct TEFRA partnership when the petitions were filed, so any appeal would likely head to the D.C. Circuit. See sec. 7482(b)(1).

[16] The attempt to continue the trial by video didn't work out, and the parties stipulated what happened during this part of the trial.

[*28] Sec. 6226(f) (emphasis added).

So what are partnership items?  Section 6231(a)(3) says that

> [t]he term "partnership item" means, *with respect to a partnership*, any item *required to be taken into account for the partnership's taxable year* under any provision of subtitle A to the extent regulations prescribed by the Secretary provide that, for purposes of this subtitle, such item is more appropriately determined at the partnership level than at the partner level.  [Emphasis added.]

The Secretary has told us what he's determined to be partnership items in section 301.6231(a)(3)-1, Proced. & Admin. Regs.  Courts still disagree over what is a "partnership item"--a very big problem given TEFRA's structural framework, which makes the distinction between partnership and nonpartnership items important to our jurisdiction.

But once we hold an item is a partnership item we have jurisdiction to determine that partnership item regardless of whether the Commissioner adjusted it in the FPAA.  See, e.g., Tigers Eye Trading, 138 T.C. at 95.  We also have jurisdiction to determine "the proper allocation of [these] * * * items among the partners and the applicability of any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item."  Id.  This latter jurisdiction isn't unlimited, however, and we have recently gone to great pains to determine its

**[\*29]** boundaries.  See, e.g., id. at 95-143; Petaluma FX Partners, LLC v. Commissioner, T.C. Memo. 2012-142, 2012 WL 1758712.

A "nonpartnership item" is "an item which is (or is treated as) not a partnership item."  Sec. 6231(a)(4).  And an "affected item" is a nonpartnership item that is affected by the determination of a partnership item.  See sec. 6231(a)(5); Ginsburg v. Commissioner, 127 T.C. 75, 79 (2006).  As it does for other nonpartnership items, the Code tells us that we can determine affected items (with the exception of certain penalties) only at the individual level and not in a partnership-level proceeding.  Because this case is appealable to the D.C. Circuit, we must follow that court's precedent.  See, e.g., Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).

II.    Partnership-Item Determinations and Adjustments[17]

    A.    Validity of the Partnerships

        1.    Unchecked Boxes

One of the most important "partnership items" is whether a partnership is actually a partnership at all.  The Commissioner says that 436 isn't a partnership–that we should disregard it because it wasn't an entity separate from

---

[17] We are deciding this case on the preponderance of the evidence, so we do not have to decide which party has the burden of proof.  See, e.g., Estate of Turner v. Commissioner, 138 T.C. 306, 309 (2012).

**[\*30]** Heitmeier and failed to satisfy the regulatory requirements to be treated as a partnership. Under the check-the-box regulations, if it doesn't make an election otherwise, an entity with only one owner is disregarded for tax purposes, and if the single owner is an individual, the regulations tell the Commissioner to treat the entity as a sole proprietorship. See supra note 9; see also Pierre v. Commissioner, 133 T.C. 24, 42-43 (2009) ("A sole proprietorship is generally understood to have no legal identity apart from the proprietor"). An entity with only one owner is thus ineligible for tax treatment as a partnership.

But 436's 2001 partnership return lists more than one owner: Heitmeier is the 99% limited partner and 94 is the 1% general partner. The Commissioner says this doesn't matter and argues that because 94 did not properly elect to be treated as a corporation, it is a disregarded entity. See sec. 301.7701-3(b)(1)(ii), Proced. & Admin. Regs. Since the parties stipulated that 94 never elected on Form 8832 to be classified as a corporation, we agree.[18] That means that Heitmeier, as the sole member of 94, will be treated as owning all of 436. And we disregard a

---

[18] While individuals and entities may apply for an employer identification number (EIN) using Form SS-4, Application for Employer Identification Number, this form alone doesn't make a valid election to be taxed as a specific type of entity. For partnerships, only Form 8832 may be used to make an election. See sec. 301.7701-3(c)(1), Proced. & Admin. Regs.; see also Form SS-4, at 3 (Rev. Apr. 2000) ("Caution: This is not an election for a tax classification of an entity").

**[\*31]** single-owner entity for tax purposes under sections 301.7701-2(a) and 301.7701-3(b)(1)(ii), Proced. & Admin. Regs., unless it elects to be taxed as a corporation.

Though these facts largely mimic those in 6611, they differ in one key way that saves us a discussion of whether a partnership existed. Heitmeier has not argued that his wife was the second owner of 94 and 436 because Louisiana is a community-property state.[19] This means we don't need to trudge through Louisiana's Civil Code to determine whether Mrs. Heitmeier would have been considered a second putative partner. But we do note it might have made a difference in the analysis of one of the many factors we generally consider to determine whether two individuals intended to join together as partners in the conduct of a business.[20] See Luna v. Commissioner, 42 T.C. 1067, 1077 (1964)

_____

[19] Although the regulation's default rule for entities owned by an individual is to treat them as sole proprietorships, its default rule for entities owned by more than one individual is to treat them as partnerships. See sec. 301.7701-3(a) and (b)(1)(i), Proced. & Admin. Regs.

[20] In 6611, we walked through the Luna factors to determine whether the taxpayers' wives would have been considered second partners in the partnership. Luna v. Commissioner, 42 T.C. 1067, 1077-78 (1964). Every factor except one clearly pointed the same way. The sole factor that required further analysis was "The Parties' Control Over Income and Capital." In 6611, Texas's community-property laws supported a proposition that "a spouse * * * [retains] sole management, control, and disposition of the community property that the spouse

(continued...)

**[\*32]** (citing <u>Commissioner v. Culbertson</u>, 337 U.S. 733 (1949)); <u>see also</u> <u>Historic Boardwalk Hall, LLC v. Commissioner</u>, 694 F.3d 425 (3d Cir. 2012), <u>rev'g and remanding</u> 136 T.C. 1 (2011); <u>Southgate Master Fund, L.L.C. ex rel. Montgomery Capital Advisors v. United States</u>, 659 F.3d 466 (5th Cir. 2011).

  2. <u>Tax-Motivated Business Purpose</u>

There is a second and separate obstacle to any finding that 436 was a partnership: A partnership does not come into existence for tax purposes until it begins its business activities. <u>See</u> <u>Torres v. Commissioner</u>, 88 T.C. 702, 737 (1987); <u>Markell Co.</u> at \*22. The caselaw is clear, however, that the pursuit of

---

[20](...continued)
would have owned if single," <u>see</u> Tex. Fam. Code Ann. sec. 3.102(a) (West 2006), and that the right as a formal partner to manage and control a partnership was not itself community property, <u>see</u> Tex. Bus. Orgs. Code Ann. sec. 152.203(a) (West 2012). Quite the opposite is true here. Louisiana has a very strong presumption in favor of community property, <u>see</u> La. Civ. Code Ann., and contains no statutes analogous to Texas'. Louisiana's Civil Code art. 2338 (2012) provides that community property includes property acquired during the marriage through the effort, skill, or industry of either spouse and the "natural and civil fruits" of community property. There is law on the books to support the interpretation that articles 2338 and 2340 include interests in joint ventures and partnerships as community property. <u>Brassett v. Brassett (In re Brassett)</u>, 332 B.R. 748 (Bankr. M.D. La. 2005). Conceivably then, Mrs. Heitmeier could have had a community-property interest in Mr. Heitmeier's partnership shares and a right to a share of any distribution of 436's surplus profits or property. <u>See also</u> La. Civ. Code Ann. art. 2346 (2012) (explaining that each spouse acting alone may manage and control community property). However, she would have failed every other factor in the <u>Luna</u> test.

[*33] business activity in furtherance of tax avoidance "is no more a business purpose than actually engaging in tax avoidance." ASA Investerings P'ship v. Commissioner, 201 F.3d 505, 513 n.6 (D.C. Cir. 2000), aff'g T.C. Memo. 1998-305. The "absence of a nontax business purpose is fatal." Id. at 512; see also Boca Investerings P'ship v. United States, 314 F.3d 625, 632 (D.C. Cir. 2003). We therefore must ask specifically if the "parties intended to join together as partners to conduct business activity *for a purpose other than tax avoidance*." ASA Investerings, 201 F.3d at 513 (emphasis added).

The 436 partnership agreement says that its primary purpose is "to make a [p]rofit, increase wealth, and provide a means for each [p]artner's [f]amily to become knowledgeable of, manage, and preserve [f]amily [a]ssets." Even if we believe what the partnership agreement says (which we don't), courts have been reluctant to find that managing and preserving family assets is a legitimate and significant nontax reason for establishing a partnership where the property doesn't require active management. See, e.g., Estate of Bigelow v. Commissioner, 503 F.3d 955, 972-73 (9th Cir. 2007) (property contributed consisted of a house that was rented to a tenant), aff'g T.C. Memo. 2005-65; Estate of Rosen v. Commissioner, T.C. Memo. 2006-115, 2006 WL 1517618, at *7 (assets contributed consisted primarily of stocks, bonds, and cash, conducted no business

[*34] activity and had no business purpose for its existence). Managing family assets just doesn't justify the existence of any entity that doesn't actively manage any property or carry on any business.

As in Markell, the record here shows exactly why 436 was formed. It was created shortly before Heitmeier purchased and contributed the options on yen and Canadian dollars to 436. The partnership didn't hold those assets for long--less than a month--before it liquidated and distributed all of the remaining property to Heitmeier. Garza's plan predetermined the mayfly-like life of 436 from its hatching to its dispatching. And we also find there wasn't a nontax need to form the partnerships to take advantage of any purported potential profits of investing in digital options and Canadian dollars. Therefore, we find that the only purpose for 436 was to carry out a tax-avoidance scheme. And we find Heitmeier never intended to run businesses under the umbrella of 436. We disregard 436 for tax purposes for this reason too.

### 3.     Consequences of Disregarding 436

When we disregard a partnership for tax purposes, we are holding that the rules of subchapter K of chapter 1 of the Code (the substantive law governing the income taxation of partners) no longer apply, and that we will deem the partnership's activities to be engaged in by one or more of its purported partners.

[*35] See id. at *34-*35. A disregarded partnership has no identity separate from its owners, and we treat it as just an agent or nominee. See, e.g., Tigers Eye Trading, 138 T.C. at 94, 96 n.32, 99. But disregarding the partnership doesn't necessarily mean that the taxpayer's investment and all items reported by the disregarded partnership are permanently reduced to zero. Although we don't respect the form, we still need to deal with the substance of the transactions to the extent we have jurisdiction. See, e.g., ACM P'ship v. Commissioner, 157 F.3d 231, 262-63 (3d Cir. 1998) (allowing deductions for securities that had "objective economic consequences apart from tax benefits * * * even when incurred in the context of a broader transaction that constitute[d] an economic sham" (citations omitted)), aff'g in part, rev'g in part T.C. Memo. 1997-115; Tigers Eye Trading, 138 T.C. at 108-09 (stating we have jurisdiction under TEFRA to determine basis of property allegedly contributed to a purported partnership, even if the partnership never existed).

The Code tells us that TEFRA procedures will still apply in these cases as long as the purported partnership filed a partnership return--which 436 did for 2001.[21] See secs. 6231(g), 6233; see also sec. 301.6233-1(b), Proced. & Admin.

---

[21] TEFRA applies generally to any partnership, but there is an exception for "small partnerships"--meaning those having 10 or fewer partners. Sec.

(continued...)

[*36] Regs. This means that we have to determine any items that would have been "partnership items," as defined in section 6231(a)(3), and section 301.6231(a)(3)-1, Proced. & Admin. Regs., had 436 been a valid partnership for tax purposes. Tigers Eye Trading, 138 T.C. at 97. This is the "hypothetical entity" approach. See id. at 148-49 (Halpern, J., concurring). We now turn to the FPAA and the pleadings to decide which items are still in play for us to decide.

### B. Capital Contributions and Distributions of Property

The Commissioner adjusted 436's reported capital contributions and distributions of property. Given that subchapter K doesn't apply to a simple agency relationship, there can be no contributions to or distributions from a partnership that does not exist. See id. at 107. The property is effectively treated as if it hadn't been contributed to or distributed from the purported partnership, and setting "Capital Contributions" and "Distributions of Property other than Money" to zero is appropriate. But that doesn't mean the underlying property has no substantive value. Since the basis (*i.e.* inside basis) of the allegedly contributed

---

[21](...continued)
6231(a)(1)(B). This exception doesn't apply if any partner is a "pass-through partner." Sec. 301.6231(a)(1)-1(a)(2), Proced. & Admin. Regs. A "pass-through partner" includes a "partnership, estate, trust, S corporation, nominee, or other similar person." Sec. 6231(a)(9). The Commissioner has determined this includes disregarded entities, see Rev. Rul. 2004-88, 2004-2 C.B. 165, and we agree. Since 436 had a single-member LLC as a partner, TEFRA procedures apply here.

**[\*37]** option contracts and Canadian money would both have been partnership

items if the partnership was respected, we have jurisdiction to determine them in

this partnership-level proceeding.

With regard to the option contracts, we echo our holding in <u>Markell</u>:

Heitmeier should have treated the foreign-currency options as a single option

spread--meaning the long and short positions were part of one contract and

couldn't have been separated as a matter of fact and law.[22]  <u>See Markell</u>, T.C.M.

_____

[22] The option legs were acquired on the same date, executed with the same
counterparty, in the same foreign currency, contingent on identical facts, listed on
a single transaction confirmation, and exercisable on the same date.  The parties
simply placed bets on one fact:  the price movement of the yen over a stated price.
Heitmeier paid a single net premium of $40,000 for the spread--the difference
between the long and short positions.  And the experts in these cases credibly
testified that Deutsche Bank would not have entered into the options unless they
were treated as linked.  If the options were separable, Deutsche Bank's risk would
be too great:  Heitmeier lacked the financial capacity to pay the premium on the
long option, and lacked the financial capacity to pay the bank the millions of
dollars that would have been due if the short option, standing alone, expired in the
money.

In <u>Helmer v. Commissioner</u>, T.C. Memo. 1975-160, 1975 WL 2787, the
taxpayers beneficially owned real property that was subject to an option.  Title to
the optioned property was held by an escrow agent, and the partnership which
granted the option received yearly option premium payments from the option
holder, and listed those amounts as distributions to the taxpayers on the
partnership's books and tax returns.  The taxpayers argued that the option
payments were for a contingent liability because the option was still outstanding.
But we held that there was no contingent liability because the transaction
underlying the option was still open, and the option premiums were not subject to

(continued...)

**[*38]** 2014-86 at *35; <u>cf.</u> sec. 1092 ("straddle" rules). The long option that 8252 purchased as Heitmeier's nominee entitled 8252 to receive $8 million from Deutsche Bank if the long option was in the money when it expired. But it would've been required to pay an almost equal amount to Deutsche Bank if the short option was also in the money on that day--$7,920,000.

The appropriate basis in the option pair is simply what 8252 paid for it. <u>See</u> sec. 1012(a). That's $40,000. The appropriate basis in the Canadian money is likewise just what 8252 paid for it as Heitmeier's nominee and agent--$4,000.

III.   <u>Penalties</u>

All that is left is the penalties. We have jurisdiction over penalties at the partnership level because they "relate to" partnership-level adjustments: We can adjust the amounts of partnership contributions and distributions in light of our determination that the partnership doesn't exist. <u>See</u> <u>Woods</u>, 571 U.S. __, 134 S. Ct. at 564 (discussing the "inherently provisional" jurisdiction of district courts in determining penalties).

The Commissioner meets any burden of production he may have on the penalty with simple arithmetic. <u>See, e.g.</u>, <u>Palmer Ranch Holdings Ltd. v.</u>

---

[22](...continued)
forfeiture. Unlike the taxpayers in <u>Helmer</u>, Heitmeier lacked the financial capacity to close the option transactions, which makes <u>Helmer</u> readily distinguishable.

**[\*39]** <u>Commissioner</u>, T.C. Memo. 2014-79 at \*43-\*44. A gross-valuation misstatement exists if the value or adjusted basis of any property claimed on the partnership return is 400% or more of the correct amount. <u>See</u> sec. 6662(e)(1)(A), (h)(2)(A). The adjusted basis or value 436 reported for Canadian dollars (described opaquely as a distribution of property) was well over 10,000% of the correct value. Any underpayment of tax attributable to that gross-valuation misstatement is subject to a 40% penalty. <u>See</u> sec. 6662(h)(1).

The only issue left in dispute is whether 436 had section 6664 reasonable-cause-and-good-faith defenses for the gross-valuation misstatement penalty. We have held that a partnership can raise this defense to that penalty at the partnership level, <u>see</u> <u>106 Ltd.</u>, 136 T.C. at 76-77, and 436 does here.

The gross-valuation-misstatement penalty can be rebutted by a showing of reasonable cause and good faith, sec. 6664(c), and a taxpayer will often argue that he had reasonable cause and showed good faith by relying on professional advice. The regulation somewhat unhelpfully states that reliance on professional advice is "reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Sec. 1.6664-4(b)(1), Income Tax Regs. The caselaw lists three factors. <u>Neonatology Assocs., P.A. v. Commissioner</u>, 115 T.C. 43, 99 (2000), <u>aff'd</u>, 299 F.3d 221 (3d Cir. 2002).

**[*40]** • First, was the adviser a competent professional who had sufficient expertise to justify reliance?

• Second, did the taxpayer provide necessary and accurate information to the adviser?

• Third, did the taxpayer actually rely in good faith on the adviser's judgment?

Heitmeier--acting in his capacity as TMP and general manager of his partnership--claims reasonable reliance on the professional opinions of Jones, Roussel, Giardina, and Garza.

A. Garza's Expertise

Garza was licensed and would have appeared competent even to a lawyer at the time the partnerships prepared their returns--at least to lawyers not versed in tax law.

B. Provision of Necessary and Accurate Information

We also find that the partnership provided Garza with all the relevant financial data needed to assess the correct level of income tax. See sec. 1.6664-4(c)(1)(i), Income Tax Regs. Garza in fact generated most of that information and certainly had it all available.

**[*41]** C.    Actual Reliance in Good Faith

It's the third point--the issue of Heitmeier's actual good-faith reliance on Garza's professional advice--that's the major weakness in the partnership's defenses:  The partnership can't rely on Garza if he was a promoter because promoters take the good-faith out of good-faith reliance.  See, e.g., 106 Ltd., 684 F.3d at 90-91; Neonatology Assocs., 115 T.C. at 98.  In 106 Ltd. (another Garza case), we defined a promoter as "'an adviser who participated in structuring the transaction or is otherwise related to, has an interest in, or profits from the transaction.'"  106, Ltd., 136 T.C. at 79 (quoting Tigers Eye Trading, LLC v. Commissioner, T.C. Memo. 2009-121, 2009 WL 1475159, at *19).

We also decided in 106 Ltd. that we would apply this definition "when the transaction involved is the same tax shelter offered to numerous parties."  See id. at 80.  Based on the records in all these cases, we find again, as we did in 106 Ltd., that Garza not only participated in structuring the transaction but also arranged the entire deal.  It was he who set up the LLCs, provided a copy of the opinion letter, and coordinated the deal from start to finish.  And he *testified* that he profited from selling the transaction to numerous clients--not just Heitmeier, but over a dozen others as well.  Heitmeier knew this.  Garza charged him a flat fee for implementing it and wouldn't have been compensated at all if he had decided not

[*42] to go through with it. He wasn't being paid to evaluate the deal or tweak a real business deal to increase its tax advantages; he was being paid to make it happen.

This makes him a promoter. And Heitmeier could not have reasonably relied on his opinion.

Heitmeier's lack of good faith and reasonable reliance is even more obvious when we turn to the other three professionals involved: Jones, Roussel, and Giardina. All three refused to endorse the proposed Garza transaction or provide any encouragement to Heitmeier other than advising him how to report it on his tax returns. Jones made clear at the outset that the Son-of-BOSS transaction was "out of his realm" and that he had no interest in even trying to understand it. Roussel and Giardina spent months trying to decide if they could endorse the transaction, and ultimately they didn't. Heitmeier could not have reasonably relied on Roussel's or Giardina's opinions in moving forward with the transaction, because the only opinions Roussel and Giardina provided were warnings that this was the type of transaction the IRS would likely go after. And their clearly

[*43] expressed reluctance to endorse the deal to their longtime client only blows another hole in Heitmeier's supposed good faith in relying on Garza.

An appropriate decision will be entered.